**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Donald FRIEDMAN, Defendant–Appellant.**

No. 03–10422.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 27, 2004.

Filed May 6, 2004.

Donald S. Frick, Sacramento, California, Donald Friedman, Butner, NC, for the defendant-appellant.

Philip A. Ferrari, Office of the United States Attorney, Sacramento, CA, for the plaintiff-appellee.

Before: T.G. NELSON, W. FLETCHER, and BERZON, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Pursuant to 18 U.S.C. § 4241(d), defendant-appellant Donald Friedman was involuntarily committed to the custody of the Attorney General based on a finding by the district court that he is incompetent to stand trial on federal criminal charges. We hold that we have jurisdiction over Friedman's appeal of this order. On the merits, we affirm the decision of the district court.

## I. Background

On January 30, 2003, Donald Friedman walked into an FBI field office with a two-page letter signed by him and addressed to Special Agent Jack Murmylo of the United States Secret Service. Friedman's letter states, in part:

> This is to inform you of my intention to torture one or more of your San Francisco agents if I do not immediately (today) get everything that I am entitled to related to the records that the U.S. Secret Service has related to me.
>
> * * *
>
> Agents of the U.S. Secret Service, as you already know, have been committing very serious crimes against me and other members of my family for a very long time, and I'm taking more direct action to prevent it from continuing.
>
> * * *
>
> I am going to get an admissible confession from at least one of your agents one way or the other, and if I don't get what I am demanding from you today, I will use the method of torture described in the attached pages [1] to obtain that con-

---

1. The attached pages, photocopied from Robert Ludlum's novel *The Janson Directive*, describe a method of torture whereby an electrical current is sent through a wire inserted into the victim's spinal column, thereby causing great pain.

fession and to punish the agent for his or her involvement in the illegal acts that your agents have perpetrated against me and my family.

\* \* \*

I have been more than reasonable, and more than patient, but I am going to get the admissible information one way or the other, and if it takes violence directed at your agents by me, so be it. I won't kill any of them, but during the torture they will wish they were dead.

\* \* \*

Have a nice day, [signed] Donald M. Friedman

Friedman believed that Secret Service agents had, among other things, arranged to have him molested when he was thirteen, fired an electromagnetic radiation-based weapon at him that caused his shoes to melt, and fired a similar weapon at his father which caused him to develop the prostate cancer that eventually killed him. Prior to this time, Friedman had apparently filed a Freedom of Information Act request for Secret Service records pertaining to him, but was dissatisfied with the response he received.

Friedman handed this letter to an FBI agent on duty at the front desk of the field office. The agent read the letter and asked Friedman three times whether he was sure that he really wanted it delivered to Special Agent Murmylo. Friedman responded each time in the affirmative. The agent explained to Friedman that the letter constituted a threat against a federal officer and, therefore, a federal crime. Friedman replied that he understood that he was about to commit a federal crime as a result of delivering the letter, and expected to be arrested that day. Finally, the agent asked Friedman if he really intended to torture Secret Service agents if his demands were not met, and Friedman confirmed that he did. Friedman was then placed under arrest and subsequently charged with one count of threatening to assault federal officers in violation of 18 U.S.C. § 115(a)(1)(B).

Friedman has, at all times, maintained the position that he is perfectly sane and competent to stand trial. Nevertheless, the government moved for, and the district court granted, an examination to determine Friedman's competency. He was accordingly examined by a psychiatrist selected by the government, who prepared a written report concluding that Friedman suffered from paranoid schizophrenia and was incompetent to stand trial. After receiving this report, Friedman requested that he be examined by a medical professional of his own choosing. The psychologist chosen by Friedman concurred with the government's psychiatrist that Friedman "is clearly psychotic and [ ] precisely fits the diagnosis of paranoid schizophrenia." He also concluded that, while Friedman was capable of understanding the nature and purpose of the proceedings against him, he was not able to assist his attorney in conducting his defense in a rational manner and was therefore incompetent to stand trial.

Meanwhile, Friedman sent several letters to the presiding district judge complaining about his attorney's performance. He also requested that the court issue a protective order against the Secret Service to prevent its agents from using electromagnetic weapons against him. In response, an agent of the Secret Service submitted a declaration to the court stating that he had reviewed internal records and determined that there were no records pertaining to electromagnetic weapons or their use against anyone, including Friedman.

The district court then held a competency hearing at which Friedman testified, *inter alia*, that the back of a pair of his shoes were vaporized by an electromagnet-

ic weapon fired at his feet in 2001. Friedman presented the shoes in question to the district court, but it appeared to the court that the heel of the shoe had simply worn out due to ordinary use. Friedman also testified that the defense he wanted to present was that the Secret Service's misdeeds toward him forced him into writing the threatening letter. He did not want to present an insanity plea, he said, because he is not insane as a general matter, nor was he temporarily insane when he made the threat. The medical professionals who examined Friedman also testified, and the court took their written submissions into evidence.

The court found that "although [Friedman] understands the nature of these proceedings, because of his mental disease the defendant refuses to assist rationally or properly in his defense and thus is incompetent to stand trial." The court therefore ordered that Friedman be "committed forthwith to the custody of the Attorney General for treatment in a suitable facility in accordance with 18 U.S.C. § 4241(d)"[2] (the "Commitment Order"). The Commitment Order was for a term of four months, as per § 4241(d)(1), and was due to end on December 17, 2003. As that date approached, the district court issued a sec-

ond order extending the commitment for an additional four months pending this appeal.

Friedman appealed the Commitment Order to this court, and the parties subsequently moved jointly for an expedited hearing. The government argued that the Commitment Order was neither a final order nor an appealable collateral order and that we therefore lacked jurisdiction to hear the appeal. Because this was an expedited appeal, we resolved it in a brief unpublished order in which we rejected the government's contention and held that we have jurisdiction over the appeal. On the merits, we affirmed the Commitment Order and remanded the action to the district court. We now explain our rulings.

## II. Appellate Jurisdiction

■■■ As a general rule, this court may only resolve appeals of "final decisions of the district courts." 28 U.S.C. § 1291. In criminal cases, this rule ordinarily prohibits appellate review until a defendant is convicted and sentenced. *Flanagan v. United States*, 465 U.S. 259, 263, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). Nevertheless, a departure from the ordinary proce-

---

2. Section 4241(d) reads:

> Determination and disposition.—If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
> (1) for such a *reasonable period of time,* not to exceed *four months,* as is necessary to determine whether there is a substantial probability that in the foreseeable future he

> will attain the capacity to permit the trial to proceed; and
> (2) for an *additional reasonable period of time* until—
> (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or
> (B) the pending charges against him are disposed of according to law;
> whichever is earlier.
> If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit the trial to proceed, the defendant is subject to the provisions of section 4246.
> (emphasis supplied).

dure is permitted when to wait for a final decision " 'would practically defeat the right to any review at all.' " *Id.* at 265, 104 S.Ct. 1051 (quoting *Cobbledick v. United States,* 309 U.S. 323, 324–25, 60 S.Ct. 540, 84 L.Ed. 783 (1940)). Thus, under the "collateral order" doctrine announced in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), "a preliminary or interim decision is appealable as a 'collateral order' when it (1) 'conclusively determine[s] the disputed question,' (2) 'resolve[s] an important issue completely separate from the merits of the action,' and (3) is 'effectively unreviewable on appeal from a final judgment.' " *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 2182 (2003) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (discussing *Cohen* )) (alterations in original). In examining these three factors, we are mindful that the Supreme Court has construed them "with the utmost strictness in criminal cases." *Flanagan,* 465 U.S. at 265, 104 S.Ct. 1051.

There can be no doubt that the Commitment Order conclusively determines Friedman's "present right to be at liberty prior to trial." *United States v. Gold,* 790 F.2d 235, 239 (2d Cir.1986). Moreover, the issue of involuntary commitment is completely separate from the issue of whether Friedman committed the crime with which he is charged. *See Sell,* 539 U.S. at 174, 123 S.Ct. at 2182. The issue is also important because the Commitment Order deprives Friedman of his freedom, a basic liberty guaranteed by the Fifth Amendment. The question, then, comes down to whether the Commitment Order would be effectively unreviewable if we delay Friedman's appeal until he is either convicted and sentenced, or acquitted.

 Several of our sister circuits have found that a commitment order entered pursuant to § 4241(d), like the one at issue here, would be effectively unreviewable on appeal from a final judgment. *United States v. Ferro,* 321 F.3d 756, 760 (8th Cir.2003); *United States v. Filippi,* 211 F.3d 649, 650–51 (1st Cir.2000); *United States v. Boigegrain,* 122 F.3d 1345, 1349 (10th Cir.1997) (en banc) (overturning prior circuit precedent); *United States v. Davis,* 93 F.3d 1286, 1289 (6th Cir.1996); *United States v. Weissberger,* 951 F.2d 392, 396 (D.C.Cir.1991); *Gold,* 790 F.2d at 239. We are unaware of any contrary authority. Judge Kearse's discussion in *Gold* is particularly persuasive:

> Unlike a ruling that the defendant *is* competent and *must* proceed to trial, which could be effectively reviewed and remedied, if erroneous, on appeal from any final judgment against him, an order finding that a defendant is not competent to stand trial and committing him for hospitalization would be effectively unreviewable on appeal from a final judgment. First, there may never be a criminal trial if the defendant is never found competent to stand trial; in this instance, there would be no appellate review. If the defendant eventually were found competent to stand trial and were acquitted, there again would be no appellate review. If the defendant were eventually found competent to stand trial and were convicted, the commitment order could be reviewed on appeal from his conviction; but the matter of the relief to be granted if the order were found to have been erroneous would be moot. Whether or not the conviction were set aside, nothing could recover for the defendant the time lost during his confinement; probably no one could be held liable to him in damages for the loss of his liberty.

790 F.2d at 239 (emphasis in original). Moreover, we believe that the Commitment Order is analogous to an order denying bail and requiring pretrial detention,

which the Supreme Court has found to be effectively unreviewable upon final judgment, and therefore immediately appealable as a collateral order. *Stack v. Boyle*, 342 U.S. 1, 6, 72 S.Ct. 1, 96 L.Ed. 3 (1951); *see Boigegrain*, 122 F.3d at 1349 (analogizing a § 4241(d) commitment order to an order denying bail and requiring pretrial detention); *Weissberger*, 951 F.2d at 396–97 (same); *Gold*, 790 F.2d at 239 (same).

The government relies on *United States v. Ohnick*, 803 F.2d 1485 (9th Cir.1986), in support of its argument that Friedman's Commitment Order under § 4241(d) is not appealable. In that case, Ohnick had already conceded incompetence to stand trial and the propriety of his temporary incarceration under § 4241(d). He was at the next step in the process, seeking to avoid indefinite incarceration under § 4246(a). Such incarceration required not only an initial determination of incompetence to stand trial, but also a subsequent determination of dangerousness. Ohnick moved to have the dangerousness determination made by a federal district court in California. When the California district court refused to assert jurisdiction over the dangerousness hearing, Ohnick appealed that refusal. When we heard the appeal, a federal district court in Missouri had already scheduled a hearing to determine Ohnick's dangerousness, and was awaiting only the outcome of Ohnick's appeal to us before proceeding with that hearing. *Id.* at 1486.

We held in *Ohnick* that the refusal by the California district court to assert jurisdiction over the dangerousness hearing under § 4246(a) was not an appealable collateral order under *Cohen*. If the Missouri district court found that Ohnick was dangerous and therefore upheld his indefinite incarceration under § 4246(a), Ohnick would have had an opportunity to challenge the merits of that determination on appeal, as well as to challenge the propriety of the Missouri district court, rather than the California district court, making that determination. *Id.* at 1487. In this case, by contrast, if Friedman is not allowed to take an interlocutory appeal from his involuntary commitment and temporary incarceration under § 4241(d), he may never be able to appeal the district court's determination that he was properly committed and incarcerated under that section.

We therefore hold that the Commitment Order is an immediately appealable collateral order.

## III. The Merits

■ We review a district court's determination that a criminal defendant is competent to stand trial for clear error. *United States v. Gastelum–Almeida*, 298 F.3d 1167, 1171 (9th Cir.2002). As recognized by the district court, § 4241(d) establishes a two-part disjunctive test of competency:

> If ... the [district] court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable[1] to understand the nature and consequences of the proceedings against him *or* [2] to assist properly in his defense, the court shall [declare the defendant incompetent and] commit [him or her] to the custody of the Attorney General.

(Emphasis supplied.) In the Commitment Order, the district court found that Friedman understood the nature of the proceedings against him, but also found that "because of his mental disease the defendant refuses to assist rationally or properly in his defense."

■ We observe that the district court's Commitment Order states that Friedman "refuses" to assist properly in his defense, not that he is "unable" to do so. Nevertheless, it is obvious from the record that

Friedman's so-called refusal to rationally assist in his defense is a direct result of his paranoid schizophrenia. For example, in a letter he wrote to the district judge in April 2003, Friedman complained that his attorney was not actively searching for evidence regarding alleged death threats from Secret Service agents against him and his family. Friedman described this evidence as "necessary [to] quickly and completely exonerate me of these charges, including the ridiculous allegations that I am somehow mentally ill or unbalanced." He therefore requested that his attorney be replaced with "someone who is going to be more diligent at obtaining the easily available evidence which is going to exonerate [him]."

In a real and important sense, Friedman's paranoid schizophrenia is preventing him from working with his attorney, rendering him "unable" to "assist properly in his defense" within the meaning of § 4241(d). *Cf. Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (holding that the proper test of competency to assist in one's defense is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"). We find no error, let alone clear error, in the district court's Commitment Order finding Friedman incompetent and committing him to the custody of the Attorney General.

AFFIRMED.