**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JESSE LEE HOWARD,
        *Defendant-Appellant.*

No. 03-50524

D.C. No.
CR-03-00390-GAF

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JOSE LUIS FARIAS-BLANCO,
        *Defendant-Appellant.*

No. 03-50525

D.C. No.
03-0861M-ABC

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JOSE ANGEL CEDILLOS,
        *Defendant-Appellant.*

No. 03-50526

D.C. No.
03-0890M-ABC

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ROBERT HERMAN BOULIES,
        *Defendant-Appellant.*

No. 03-50527

D.C. No.
03-0945M-ABC

15309

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

DANIEL RIVERA-GONZALEZ,
          *Defendant-Appellant.*

No. 03-50532
D.C. No.
CR-03-00435-
RSWL


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

JORGE PINEDA-FERNANDEZ, a/k/a
Jorge Peneda,
          *Defendant-Appellant.*

No. 03-50533
D.C. No.
CR-03-00439-GHK


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

RANDOLPH ARTHUR CISNEROS,
          *Defendant-Appellant.*

No. 03-50534
D.C. No.
CR-03-00486-
RSWL


UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

CORNELIO GARCIA-CHAVEZ,
          *Defendant-Appellant.*

No. 03-50535
D.C. No.
CR-03-00493-NMM

United States of America,
       *Plaintiff-Appellee,*

      v.

Jose Cabanillas-Nunez, a/k/a Jose
Arsenio Cabanillas, Jose Arencio
Nunez,
       *Defendant-Appellant.*

No. 03-50536
D.C. No.
CR-03-00509-DMT


United States of America,
       *Plaintiff-Appellee,*

      v.

Raymond Flores,
       *Defendant-Appellant.*

No. 03-50537
D.C. No.
CR-03-00516-R-02


United States of America,
       *Plaintiff-Appellee,*

      v.

Christian Raudales,
       *Defendant-Appellant.*

No. 03-50538
D.C. No.
CR-03-00533-FMC-
02


United States of America,
       *Plaintiff-Appellee,*

      v.

Miguel Lencia,
       *Defendant-Appellant.*

No. 03-50539
D.C. No.
03-0858M-ABC

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

   v.

RAYMOND CAZARES,
   *Defendant-Appellant.*

No. 03-50540
D.C. No.
03-089M-ABC

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

   v.

VERNON CROCKER,
   *Defendant-Appellant.*

No. 03-50541
D.C. No.
03-0899M-ABC

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

   v.

LORENA GALLARDO,
   *Defendant-Appellant.*

No. 03-50542
D.C. No.
03-0944M-ABC

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

   v.

JEFFREY DARRYL WAFER,
   *Defendant-Appellant.*

No. 03-50543
D.C. No.
03-0860M-ABC

United States of America,
         *Plaintiff-Appellee,*

v.

Pedro F. Sandoval-Sandoval,
         *Defendant-Appellant.*

No. 03-50544
D.C. No.
03-0896M-ABC

United States of America,
         *Plaintiff-Appellee,*

v.

Carlos Alvarez,
         *Defendant-Appellant.*

No. 03-50545
D.C. No.
03-0942M-ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
November 1, 2004—Pasadena, California

Filed November 15, 2005

Before: Mary M. Schroeder, Chief Judge, Ronald M. Gould
and Richard R. Clifton, Circuit Judges.

Opinion by Chief Judge Schroeder;
Dissent by Judge Clifton

**COUNSEL**

David S. McLane, Pasadena, California, for the defendants-appellants.

William Crowfoot, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

SCHROEDER, Chief Judge:

This is an interlocutory appeal by criminal defendants challenging a requirement that pretrial detainees making their first appearance before a magistrate judge wear leg shackles. The district-wide shackling policy was implemented by the United States Marshals Service for the Central District of California after consultation with the magistrate judges. In each of these seventeen cases, the magistrate judge denied the Federal Public Defender's motion for the defendant to appear without shackles at the initial appearance. The district court reviewed

these adverse magistrate judges' rulings in a consolidated appeal. The district court, citing general safety concerns, affirmed the magistrate judges' shackling decisions. The record contains no documentation or explanation of specific problems that led up to the enactment of the shackling policy.

Before reaching the merits of the case, we must deal with appellate jurisdictional obstacles raised by the government. These are questions of mootness and appellate jurisdiction over interlocutory orders. We conclude that the case is not moot because the issues are capable of repetition and will otherwise evade review, and that we have appellate jurisdiction to review the orders that finally dispose of issues collateral to the merits of the cases.

On the merits, because it is undisputed that the policy effectuates a diminution of the liberty of pretrial detainees and distracts from the dignity and the decorum of a critical stage of a criminal prosecution, we conclude that the shackling policy requires adequate justification of its necessity. On the basis of the limited record before us, we conclude we must vacate the district court's order upholding the policy, but we do not preclude the reinstatement of a similar policy upon a reasoned determination that it is justified on the basis of past experiences or present circumstances in the Central District.

## BACKGROUND

Defendants appeal the denial of their motions to appear unshackled before various magistrate judges of the Central District of California during defendants' initial appearances. As part of the policy of the United States Marshals Service for the Central District of California, in-custody defendants are shackled in leg restraints for their initial appearances in front of magistrate judges. According to the district court, magistrate judges at the initial appearance read defendants their rights, confirm that defendants have received a copy of the complaint or indictment stating the charges against them,

appoint counsel to represent the indigent defendants, set dates for preliminary hearings and post-indictment arraignment, and make preliminary determinations of bond and detention issues. In some cases, the initial appearance includes an evidentiary detention hearing with testimony by lay witnesses or law enforcement officers.

The record contains little evidence about the history of the shackling policy. The policy was enacted in April of 2003 by the United States Marshals Service for the Central District of California. The record indicates that the Marshals Service consulted with the magistrate judges before enacting the policy, although it is not clear to what extent. The record also indicates that, historically, defendants in the district generally were not shackled at initial appearances, although there appears to have been at least some period in the past when defendants were both shackled and handcuffed at initial appearances.

There is little in the record to explain why this policy was adopted. The record does not indicate whether any other district in this or other circuits has a similar policy. This record contains the declaration of Robert Masaitis, Chief Deputy United States Marshal for the Central District of California. He states that "it is not possible to conduct an individualized analysis of a defendant at the time of the initial appearance," and further states that the shackling policy is necessary to ensure safety and order in the courtroom. He also states that the need for full restraints is enhanced by the current staffing shortages in the Marshals Service. The declaration does not discuss any more specific security problems that the policy was intended to address, or any incidents that preceded the enactment of the policy.

We also have a memorandum from Adam N. Torres, United States Marshal for the Central District of California, to the district court judges detailing an incident in one district court judge's courtroom in June of 2003. That incident did not

relate to a first appearance, but involved conduct of a defendant who was restrained during the reading of his jury verdict of conviction after he verbally attacked Assistant United States Attorneys and an FBI Agent.

In each of these consolidated cases, the defendant was represented by the Federal Public Defender and made his initial court appearance shackled. The Federal Public Defender moved that the defendant be permitted to appear without shackles. In some cases, the magistrate judges allowed the Federal Public Defender to argue the motion. In no case did the magistrate judge hold an evidentiary hearing on the motion. The magistrate judge denied the motion in each case.

In a consolidated appeal from interlocutory orders, the Federal Public Defender sought district court review of the magistrate judges' denials of the motions. The district court, without a hearing, affirmed the magistrate judges' shackling decisions. It noted that shackling may indeed detract from the dignity and decorum of judicial proceedings, but concluded that safety interests outweighed this concern. The district court noted that any other potential problems with shackling could be addressed in an individual case, if necessary. Therefore, the district court held that the policy did not deprive the defendants of their due process rights. This consolidated appeal followed.

## MOOTNESS

[1] The government argues that this case is moot because no effective relief can be ordered at this stage for these defendants whose criminal pretrial proceedings are over. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002). Article III, Section 2 of the Constitution limits federal court jurisdiction to "cases" and "controversies." This case or controversy requirement exists through all stages of federal judicial proceedings. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). A number of doctrines have developed, however, to permit

courts to review a case in which it is no longer possible to remedy the particular grievance giving rise to the litigation.

**[2]** One is the exception to the mootness doctrine for violations "capable of repetition yet evading review." *See, e.g.*, *Gerstein v. Pugh,* 420 U.S. 103, 111 n.11 (1975). This is such a case. In *Gerstein,* the Supreme Court stated that very brief pretrial detention is by nature temporary, because it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is released or convicted. *Id.* There the Supreme Court held the exception to the mootness doctrine for violations "capable of repetition yet evading review" applied because the constitutional violation was likely to be repeated, but would not last long enough to be reviewed before becoming moot. *Id.*

**[3]** An initial proceeding in a criminal case is even more temporary than the pretrial detention at issue in *Gerstein*. This case evades review for essentially the same reason. The defendants could not have brought the challenges to the shackling by the magistrate judge to the district court, much less to us, before the harm of shackling at the initial proceeding was completed.

**[4]** This situation giving rise to this challenge also is capable of repetition. We acknowledge that we cannot assume that criminal conduct will be recurring on the part of these defendants. *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). This case is therefore distinguishable from an abortion case, the classic case capable of repetition yet evading review, because we can assume a woman can become pregnant again. *See generally Roe v. Wade*, 410 U.S. 113, 125 (1973). This makes no material difference, however, because a future charge assuredly will be brought against someone, and the shackling policy would similarly escape review.

For this reason, we have held that a case is capable of repetition when the defendants are challenging an ongoing gov-

ernment policy. *Oregon Advocacy Cntr v. Mink*, 322 F.3d 1101, 1118 (9th Cir. 2003). In *Oregon Advocacy Center*, the plaintiffs alleged that the state mental hospital, which was charged with evaluating and treating mentally incapacitated defendants, refused to accept the defendants on a timely basis. *Id.* at 1105-06. The plaintiffs challenged a state policy that results in the delays. *Id.* at 1118. We held that although the particular situation precipitating a constitutional challenge to a government policy may have become moot, the case does not become moot if the policy is ongoing. *Id.* "The continued and uncontested existence of the policy that gave rise to [the] legal challenges forecloses [the] mootness argument." *Id.*

The D.C. Circuit similarly held that when a complaint challenges an acknowledged government policy, the government cannot prevail by arguing that the controversy became moot when the particular situation at issue resolved itself. *Ukranian-American Bar Ass'n v. Baker*, 893 F.2d 1374, 1377 (D.C. Cir. 1998). The defendants in this case are challenging an ongoing government policy.

[5] As a practical matter, this case is materially similar to a class action in which the class representative's claims may become moot, but there are members of the class whose claims are not moot. The Supreme Court has held that under the capable of repetition yet evading review doctrine, the termination of a class representative's claim does not moot the claims of other class members. *See Gerstein*, 420 U.S. at 111 n.11. This holding applies outside of the class action context when the circumstances of the case are analogous to those found in class action cases. *Oregon Advocacy Cntr*, 322 F.3d at 1117; *see also Gerstein*, 420 U.S. at 111 n.11. The defendants in this case are seeking to represent interests broader than their own, and the attorney bringing the case is a Federal Public Defender with other clients with a live interest in the case. *See Gerstein*, 420 U.S. at 111 n.11; *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001).

**[6]** The government suggests that this kind of blanket challenge to a procedure used in prosecutions must be brought as a civil class action rather than within the relevant criminal proceedings in which it arose. Our case law does not establish that a civil forum is the exclusive remedy. Indeed, it may be more appropriate to decide this case in the context of actual prosecutions rather than by resort to hypotheticals or generalizations. On a practical level, we must understand that this particular challenge could not be made in the civil context, because the only available attorney to represent these criminal defendants is the Federal Public Defender. The Federal Public Defender cannot pursue a civil class action on their behalf, because there is no provision for the appointment of a Federal Public Defender in a civil action, and the office of Federal Public Defender is barred from instituting any action on its own. *See* 18 U.S.C. § 3006A(a), Administrative Office of the U.S. Courts, *Guide to Judiciary Policies and Procedures*, Vol. VII, Ch. IV. This is still another reason why we should not hold that this challenge can proceed as only a civil action.

## APPELLATE JURISDICTION

**[7]** The government contends that we lack appellate jurisdiction because this is not an appeal from a final district court judgment, but from a ruling in consolidated interlocutory appeals. Courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. There is an exception to the final judgment rule for certain interlocutory orders, known as "collateral orders," where review of a final judgment would be unavailing. This exception applies when the order (1) will conclusively determine the disputed question, (2) will resolve an important issue completely separate from the merits, and (3) is effectively unreviewable on appeal from a final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). Adherence to the rule of finality has been particularly stringent in criminal prosecutions, because the delays and disruptions that come with interlocutory orders can hinder the

effective and fair administration of the criminal law. *Abney v. United States*, 431 U.S. 651, 656 (1977).

**[8]** All of the requirements of the collateral order doctrine apply here. The shackling order conclusively determines the disputed question of whether the shackling policy is permissible. This question is wholly separate from the merits of the underlying action. Therefore, the question before this court is whether the order would be effectively unreviewable if the court delayed the defendants' appeals until they are either convicted and sentenced, or acquitted. *See United States v. Friedman*, 366 F.3d 975, 979 (9th Cir. 2004). The order must involve "an important right which would be 'lost, probably irreparably,' if review had to await final judgment." *Abney*, 431 U.S. at 658.

**[9]** Even assuming that defendants' claims could be reviewed on appeal from conviction, their claims could not be reviewed if they are acquitted. *See Sell v. United States*, 539 U.S. 166, 176-77 (2003); *Friedman*, 366 F.3d at 979. In most cases, a defendant's rights would be sufficiently vindicated by an acquittal. *See, e.g., Flanagan v. United States*, 465 U.S. 259, 265 (1984) (acquittal would remedy harm of order disqualifying counsel); *United States v. MacDonald*, 435 U.S. 850, 859 (1978) (acquittal would remedy harm of speedy trial violation). This case, however, falls within a subset of cases in which acquittal does not undo the harm to the defendant. The Supreme Court has held, for example, that an order to deny bail and require pretrial detention cannot effectively be reviewed on appeal. *Stack v. Boyle*, 342 U.S. 1, 6 (1951). Similarly, we have held that involuntary commitment of a defendant is effectively unreviewable on appeal, because there would be no appellate review if the defendant was found not competent to stand trial or acquitted. *Friedman*, 366 F.3d at 979. We find this case to be analogous. An acquittal in this case would favorably terminate the prosecution of the defendant, but would not affect the deprivation of liberty that

occurred during the pretrial hearing. *See Sell*, 539 U.S. at 176-77; *Friedman*, 366 F.3d at 979.

**[10]** Therefore, defendants' claims are effectively unreviewable on appeal from a final judgment. The district court's order reviewing the magistrate judges' determinations is an appealable collateral order.

### MERITS

**[11]** This court has not decided whether a general policy of shackling a defendant for a proceeding in front of a judge violates due process. Nearly all of the litigation concerning shackled defendants arises in the context of proceedings in front of a jury. *See, e.g.*, *Deck v. Missouri*, 125 S.Ct. 2007 (2005) (extending the general prohibition on the use of shackles to the penalty phase of a jury trial); *Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995); *Jones v. Meyer*, 899 F.2d 883 (9th Cir. 1990); *Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989). These cases turn in large part on fear that the jury will be prejudiced by seeing the defendant in shackles. *See Deck*, 125 S.Ct. at 2013; *Duckett*, 67 F.3d at 748; *see also Illinois v. Allen*, 397 U.S. 337, 344 (1970). Fear of prejudice is not at issue in the present case, as a judge in a pretrial hearing presumably will not be prejudiced by seeing defendants in shackles. Other courts have disagreed about whether shackling a defendant for a proceeding in front of a judge violates due process. *Compare United States v. Zuber*, 118 F.3d 101, 104 (2d Cir. 1997) (finding no due process violation), *with People v. Fierro*, 821 P.2d 1302, 1322 (Cal. 1992) (finding due process violation).

**[12]** Shackling a defendant in any judicial proceeding can have negative effects. The Supreme Court has stated that "the use of [shackling and restraints] is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*, 397 U.S. at 344; *see Deck*, 125 S.Ct. at 2013. Moreover, the Supreme

Court expressed concern that restraints could greatly reduce the defendant's ability to communicate with his counsel. *Id.* This court has noted that shackling may confuse and embarrass the defendant, thereby impairing his mental faculties. *See Duckett*, 67 F.3d at 747-48, *citing Spain*, 883 F.2d at 720-21. Shackling may also cause the defendant physical and emotional pain. *See Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999); *Spain*, 883 F.2d at 720-21.

**[13]** Defendants contend that the Marshals Service's shackling policy violates their due process rights. Before a defendant can be shackled in front of a jury, the court must be persuaded by compelling circumstances that some measure is needed to maintain security, and that no less restrictive alternatives are available. *Jones*, 899 F.2d at 884-85. Defendants contend that due process requires that there be no restraining whatsoever without an individualized determination.

We observe, without deciding the issue, that this may go farther than due process requires. But we do not have to reach this question. The record here gives no justification or describes any circumstances existing district-wide that would support the district requiring such restraint.

**[14]** At a minimum, due process requires that before there is any district-wide policy affecting all incarcerated defendants whom the government must transport to a first appearance, there must be some justification. The Supreme Court has stated that "if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Thus, a pretrial detainee has a substantive due process right against restrictions that amount to punishment.

Cases addressing the substantive due process rights of pretrial detainees typically involve challenges to prison policies.

*See, e.g.*, *id.* Courts ordinarily defer to the expert judgments and professional expertise of corrections officials. *Id.* at 547-48. Corrections officials must produce at least some evidence that their policies are based on legitimate penological justifications. *Swift v. Lewis*, 901 F.2d 730, 733 (9th Cir. 1990).

Restrictions on defendants during judicial proceedings, however, are not within the realm of correctional officials. The conduct of judicial proceedings is the domain of the courts. Preservation of dignity and decorum are necessary for the conduct of judicial proceedings that determine issues of liberty and life.

For this reason this court cannot give the government courtroom policies the same degree of deference that it would give to the government prison policies. A court should insist on some showing that a policy impinging on defendants' freedoms and ability to communicate, as well as diminishing the decorum of the court proceedings, is reasonably related to a legitimate goal. By requiring the government to establish the need for the policy, the court can ensure that the policy does not constitute punishment of pretrial detainees during judicial proceedings.

**[15]** In this record, there is no explanation of whether a similar shacking policy exists in any other districts. There is no evidence of specific instances that show a need for this shackling policy in the Central District. Rather, the only support for the policy is the conclusory declaration of a single representative of the Marshals Service that the policy is necessary because of safety concerns and financial limitations.

**[16]** As we have seen, the record contains no evidence of safety concerns necessitating this policy in this district. There is no basis on which we can assume the benefits of the policy outweigh the costs and the disadvantages. The Supreme Court has already held that financial concerns should not be a justification for cutting back on the constitutional rights of crimi-

nal defendants. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992). For example, we have held that a city's financial crisis does not allow it to maintain over-crowded jails that deprive people of their constitutional rights. *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992); *see also Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). As one commentator has put it, "[a]llowing a governmental entity to plead budgetary constraints allows it to second-guess the Court's determination of what the law requires and to argue, in essence, that it is exempt from constitutional standards." *See* Barbara Kritchevsky, *Is there a Cost Defense? Budgetary Constraints as a Defense in Civil Rights Litigation*, 35 Rutgers L.J. 483, 560 (2004).

[17] There may well be good reasons for the policy, but we don't yet know what they are. We therefore reverse the district court's order affirming the magistrate judges' shackling decisions. We order the existing shackling policy rescinded, but we do not preclude reinstatement of a similar policy upon a showing of adequate justification. This, at a minimum, means a showing sufficient to support a reasoned determination that the policy is justified on the basis of past experiences or present circumstances in the Central District.

We remand the case to the district court for proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

CLIFTON, Circuit Judge, dissenting:

I agree with my colleagues that we may properly reach the merits of this case. I also agree that the record seems somewhat thin regarding the benefits and detriments of the policy adopted in the Central District of California of requiring in-custody defendants to wear leg restraints or shackles during

the initial court appearance before a magistrate judge. My view of the law would require a much stronger showing to set aside the policy than has been made by the defendants here, however. The justification for the policy — to improve court security — is evident, while there is essentially nothing in the record that demonstrates any actual negative impacts from the practice when there is no jury present to be influenced, as there is not during the initial court appearance. At a time when concern for court security is understandably and properly high, I would accept the judgment of the district court — and the collective judgments of the judicial officers most affected, the magistrate judges of the Central District — and affirm.

As an initial matter, I disagree with the majority opinion regarding the legal basis on which it rests its reversal of the district court. The majority opinion refers to the substantive due process rights of pretrial detainees against restrictions that amount to punishment, but that is premised on an inference that the leg-restraint policy is "punishment" because it is " 'not reasonably related to a legitimate goal — . . . it is arbitrary or purposeless — [such that] a court permissibly may infer that the purpose of the governmental action is punishment.' " *Ante* at 15326 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

There is not the slightest suggestion in the record here that the leg-restraint policy was intended to be punitive. The district court found that the policy was adopted "[b]ecause of security concerns," and that finding was not clearly erroneous.

That being the case, *Bell* instructs us differently as to the law. The portion quoted by the majority opinion was preceded by the following statement: "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " *Id.* That sentence was accompanied by a footnote, which stated, in part: "[I]n the absence of a

showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Id.* at 539 n.20. And the sentence quoted by the majority, regarding purposeless restrictions which may be inferred to amount to punishment, is followed by another footnote: " 'There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.' " *Id.* at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

In the absence of any evidence of an intent to punish, or any evidence that a defendant required to wear leg restraints during the initial public hearing suffers any actual harm (or more than *de minimis* harm), there can be no due process violation. The holding of *Bell* was that certain conditions of confinement complained of by pretrial detainees at the Metropolitan Correction Center in New York City did *not* violate the Due Process Clause. The Court *reversed* a decision by the Second Circuit that "pretrial detainees may be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.' " *Wolfish v. Levi*, 573 F.2d 118, 124 (2d Cir. 1978) (quoting *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974)).

The approach taken by the majority opinion echoes the erroneous approach of the Second Circuit, which the Court reversed in *Bell*, by putting the burden on the district court and the U.S. Marshals Service to justify the necessity for the leg-restraint policy. *Bell* put the burden, which it described as "heavy," on the defendants objecting to the restrictions: "Respondents simply have not met their heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions

and practices." *Id.* at 561-62. The defendants have not nearly met that "heavy burden" here, either.[1]

The Central District of California is the largest federal judicial district in the country. The district is authorized to have twenty-two full-time magistrate judges, plus one part-time position. As indicated by the district court's order, the policy in question was discussed by the magistrate judges of the district in April 2003. They decided to approve the policy and to apply it uniformly to the initial appearances of all in-custody defendants in the district.

The district court affirmed the policy, announcing its findings in the form of the statement of facts section in its order filed October 8, 2003:

> The initial appearances of in-custody defendants take place in a large courtroom on the third floor of the Roybal Courthouse. The number of in-custody defendants present in the courtroom can vary greatly depending upon the number of arrests made. At the initial appearance, magistrate judges read defendants their rights, confirm that defendants have received a copy of the complaint or indictment stating the charges against them, appoint counsel to represent the indigent defendants, and set dates for the defendants' preliminary hearings and post-indictment arraignment.

---

[1]That is why, in part, the observation in the majority opinion that "financial concerns should not be a justification for cutting back on the constitutional rights of criminal defendants" misses the point. *Ante* at 15327-28. There is no constitutional right for a defendant in custody to be free of leg restraints. Nor does the Due Process Clause require the government to hold pretrial detainees or defendants in the courtroom in the manner that is least restrictive for the defendant, no matter what the expense. In making this decision about court security, there is nothing inappropriate about the court and the Marshals Service taking into account the resources available.

The magistrates also make a preliminary determination of bond and detention issues. In some cases, a full evidentiary detention hearing will occur at the initial arraignment. Lay witnesses or law enforcement officers may testify at these hearings. Friends and family members of defendants often are present to act as potential sureties and to give defendants support. Their presence, while appropriate, adds to potential security concerns.

Because of security concerns, the United States Marshal Service ("USMS") adopted certain policies after consultations with the magistrate judges. As part of USMS policy, defendants are fully restrained while being transported to the courtroom. For their initial appearances, the waist chains and handcuffs are removed, but the leg restraints ("shackles") are not removed. United States Marshals are trained in properly applying restraints so that the restraints do not cause pain.

Shackling is designed to ensure that courtrooms are safe and orderly.[2] Even while restrained defendants have assaulted members of the USMS, as well as other members of the government.[3] According to the acting United States Marshal, the need for restraints is particularly acute given the current staff-

[2]Rather than shackles, Los Angeles Superior Court uses cages in which defendants must remain during their initial appearance. (Footnote in original) (citation omitted).

[3]In the courtroom of the Honorable William Rea on June 5, 2003, an unshackled prisoner verbally attacked the Assistant United States Attorneys and FBI case agent after the prisoner was convicted. "When the deputies began to handcuff the defendant he resisted and pulled away. The deputies were required to take the defendant to the floor in order to handcuff him and take him into custody." (Footnote in original) (citations omitted).

ing shortages at the USMS. The USMS currently has just 59% of its allocated staffing for this district.

The USMS believes that it "is not possible to conduct an individualized analysis of a defendant at the time of the initial appearance," in part, because "it is not possible to obtain a criminal history." Moreover, the magistrates appear to agree that a uniform shackling policy should apply at initial appearances. . . . .

(Citations omitted).

The general motivation for the policy is plain. As the district court found, the Marshals Service adopted the policy "[b]ecause of security concerns." The policy is intended "to ensure that courtrooms are safe and orderly." That is confirmed by the April 10, 2003 memorandum in which the Marshals Service described the policy. It made clear that it was based upon the authority of the Service to "provide courtroom security for the Federal Judiciary [and] protection of Federal Jurists and other court officers." The document expressly noted that "there is no greater responsibility tasked to the U.S. Marshals Service than that of ensuring the protection of the Judicial Process, which includes the personal protection of all entities (Jurists, jurors, U.S. Attorneys, defense counsel, and others) as well as the safeguarding and security of federal prisoners."

The subject of court security has received substantially greater attention since then because of two tragic episodes earlier this year. One was the murder of the husband and mother of a federal district judge in Chicago, Illinois on February 28, 2005, by a disgruntled civil litigant. The other was the murder by a criminal defendant of a state court judge and a court reporter inside the Fulton County, Georgia courthouse, as well as a deputy sheriff outside the courthouse, on March 11, 2005. Neither of these incidents arose in the context of an initial appearance by a criminal defendant before a federal

magistrate judge, of course, but they underscore the inherent danger that lurks in a courthouse. Many of the people there are prone to violence and are under enormous stress.

The Judicial Conference of the United States responded to these events by adopting a resolution at its meeting in March 2005 which asked the Justice Department and the Marshals Service "to review fully and expeditiously *all aspects* of judicial security." (Emphasis added.) The following month, the chair of the Judicial Conference Committee on Security and Facilities, Judge Jane Roth of the Third Circuit, told a House subcommittee, as reported by the official newsletter of the federal courts, that the Marshals Service judicial security program is "chronically understaffed and underfunded." *U.S. Marshals Service Resources Faulted by Federal Judiciary*, The Third Branch, May 2005, at 1. The staffing shortages described eighteen months before by the district court in this case are a reflection of this chronic problem.

I simply cannot conclude, as does the majority opinion, that the record gives no justification for the policy or fails to describe circumstances which support the application of a district-wide policy. *Ante* at 15326. The district court concluded that it was not possible to obtain criminal histories of all in-custody defendants prior to their initial appearances, let alone to do an analysis of the threat posed by each individual. Perhaps only a few of defendants pose a serious threat, but if it cannot be determined by the time of the initial appearance which defendants those are, it is logical to be cautious with all of them. An ounce of prevention is, after all, worth a pound of cure. These defendants are fully restrained — with handcuffs and waist chains in addition to the leg restraints — before and after their courtroom appearances, and no objection to that treatment has been made here. The advantage of maintaining some of that control in the courtroom, by leaving the leg restraints on when the handcuffs and waist chains are removed, is clear. That is particularly true when the Marshals Service is understaffed, as we know that it is. If we cannot be

sure that there will be sufficient deputy marshals or other security officers present in the courtroom to control all unrestrained defendants, then it makes sense to leave the leg restraints on, unless there is a reason not to.

There is, of course, a very good reason not to when doing so might prejudice the defendant. As the majority opinion notes, nearly all of the caselaw on this subject has involved a proceeding in front of a jury. *Ante* at 15325. The use of shackles or restraints in a context where they might be observed by a jury could have a negative and prejudicial effect. The law on that subject is well-established, as most recently discussed by the Supreme Court in *Deck v. Missouri*, 125 S. Ct. 2007 (2005). In that case the Court held that the use of visible shackles during the penalty phase of a capital murder trial is forbidden, just as it forbidden during the guilt phase, unless that use is "justified by an essential state interest — such as the interest in courtroom security — specific to the defendant on trial." *Id.* at 2009 (internal quotation marks omitted). But in the current case, fear of such prejudice is not at issue, as the majority opinion acknowledges, *ante* at 15325, because there is no reason to presume that the magistrate judge will be prejudiced by seeing the defendant in leg restraints.

Reasons not to permit the regular use of leg restraints in the context of the initial appearance before the magistrate judge are much harder to pin down. Indeed, if the record in this case fails to provide support for some proposition, it is the proposition that any actual harm has resulted from the use of leg restraints. On that score, the record is completely blank.

The negative effects identified by the majority opinion appear to fall into two categories. One is that the use of restraints would constitute " 'an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' " *Ante* at 15325 (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). But the Court in *Allen* was discussing a

defendant completely restrained, "bound and gagged," *id.*, during his trial before a jury, not a defendant wearing leg restraints while making an initial appearance in a courtroom filled with other defendants awaiting their initial appearances. Anyone who has been present in a courtroom filled with such defendants, particularly in a busy urban court, understands that "decorum" is a relative thing. More to the point, what effect the leg-restraint policy has on the decorum of the court and what negative impact that has on the defendant may be impossible to define precisely, but I have to believe that the answers are "not much" and "none." The alternative identified by the district court as that used in Los Angeles Superior Court — the use of cages — certainly seems much worse. There is nothing in this record that establishes any negative impact on the dignity of the court. Since the policy at issue was specifically approved by the judicial officers most affected and in the best position to evaluate the impact on the court, namely the magistrate judges of the Central District, I conclude that this factor adds little if any weight to the negative side of the scale.

The second category focuses more directly on the negative impact on the defendants. Thus, the majority opinion notes that the Court in *Allen* "expressed concern that restraints could greatly reduce the defendant's ability to communicate with counsel." *Ante* at 15326. That is true, but in *Allen* the Court was talking about a defendant who was "gagged," not one simply wearing leg restraints. It is not apparent how leg restraints, without a gag, would prevent a defendant from talking with his attorney. There is nothing in the record from any of the eighteen defendants challenging the policy, any of their attorneys, any other defense attorney, or anyone else that explains or illustrates how the use of leg restraints prevents communication, let alone attesting to any actual prejudice or negative impact from the policy at issue.

Similarly, the majority opinion refers to observations in other court decisions to the effect that "shackling may confuse

and embarrass the defendant, thereby impairing his mental faculties." *Ante* at 15326. In the context of the initial appearances at issue in this case, that appears to be pure speculation. We are dealing with defendants who have been held in custody, then transported to the courtroom wearing handcuffs, waist chains, and leg restraints. At the courtroom, the handcuffs and waist chains are removed. That the leg restraints are not removed as well is unlikely to have such a dramatic effect on the defendant. Again, there is nothing in the record that supports the conclusion that it does.

Finally, the majority opinion states that there may be "physical and emotional pain" suffered by the defendant. *Ante* at 15326. But no defendant has attested to any such pain. There is nothing in the record supporting that conclusion. Why pain would be uniquely felt from wearing leg restraints in the courtroom by a defendant who wore the same leg restraints and also handcuffs and a waist chain before and after the courtroom appearance, while being transported to and from the courtroom, is not evident. The district court here found that the marshals are trained in properly applying restraints so that the restraints do not cause pain. That finding was not clearly erroneous.

Thus, I disagree with the conclusion in the majority opinion that there is "no basis on which we can assume the benefits of the policy outweigh the costs and the disadvantages." *Ante* at 15327. In my view, what the record fails to support is the notion that there are actual costs and disadvantages. The potential benefit of restraining defendants is plain.

What is unknown here is the probability that some unfortunate incident will occur without the leg restraints. On that subject I agree with the majority that the record does not demonstrate a substantial risk. But we should not limit the court's ability to take precautions to situations of demonstrated or substantial risk. In over thirty-five years of driving, I have never been in a serious automobile accident, and the percent-

age chance of that happening the next time I climb into my car is, I assume, incredibly small, but that does not mean that I should not buckle my seat belt and make sure that everyone else is buckled up, too. Effective security necessarily means protecting against the highly unlikely and against something that may not previously have occurred. The court should not have to suffer a tragedy before taking precautions.

The decision whether or not to adopt this policy involved a balancing of the perceived benefits, which includes a consideration of the amount of risk, and of the detriments. Because I see very little on the negative side of the scale, at least on the current record, I would not disagree with the decision of the Central District that the benefits of the policy outweigh the detriments. More importantly, under the proper legal standard, I do not believe defendants have demonstrated a violation of the Due Process Clause.

Like the majority, I agree that our decision today should not be the last word, and I would say that even if my view prevailed and we affirmed. This policy should be subject to further consideration and review, and if a challenge to the policy demonstrated a negative impact the court should take that into account. On the current record, though, that impact has not been shown.

Justice Breyer's opinion for the Court in *Deck* noted that the rule that a criminal defendant may be shackled during a criminal trial only when there is a special need had "deep roots in the common law." 125 S. Ct. at 2010. It also noted, however, that "Blackstone and other English authorities recognized that the rule did not apply at 'the time of arraignment,' or like proceedings before the judge." *Id.* (citations omitted). Blackstone was right. That rule should not apply here.

I respectfully dissent.