# IN THE SUPREME COURT OF IOWA

No. 16–0955

Filed April 27, 2018

**STATE OF IOWA,**

Appellee,

vs.

**WONETAH EINFELDT,**

Appellant.

---

Appeal from the Iowa District Court for Dallas County, Randy Hefner, Judge.

A defendant argues that the district court erred in failing to order a competency hearing during trial and in excluding certain evidence. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, Wayne Reisetter, County Attorney, and Stacy L. Ritchie and Ronald Forsell, Assistant County Attorneys, for appellee.

**APPEL**, **Justice.**

This appeal involves an important intersection involving mental illness and the criminal justice system. In this case, a criminal defendant's lawyer moved midtrial for a competency examination of his client who, due to the stresses of trial was "incapable of aiding [him] in her defense." The record reveals that the client, among other things, testified she suffered from paranoid schizophrenia but had stopped taking prescribed medications due to lack of funds, stated that she wanted to stab her lawyer in the neck and wanted to kill him, declared that she did not know why her lawyer was sitting next to her, told the court that she had called the FBI and was told she did nothing wrong, and further declared that she would not write notes to her lawyer during trial for fear the lawyer would pass the notes to the prosecution. The district court denied the motion and the case proceeded to verdict. On appeal, the defendant claims the district court erred in not ordering a competency examination and in excluding evidence. For the reasons expressed below, we reverse the judgment of the district court and remand the case for further proceedings.

## I. Factual Background.

Wonetah Einfeldt and her two daughters were charged with willful injury causing bodily injury over a physical altercation between the three women and a fourth woman named Mulika Vinson on July 14, 2015. The case went to trial and the defendants were tried jointly.

Prior to trial, the State sought to exclude all character evidence about the victim, Vinson. This included evidence related to Vinson's prior threatening behavior and her convictions for two assaults and an escape in Nebraska in 2001. She was fifteen or sixteen years old at the time of the first assault and nineteen years old at the time of the second

assault. At the time of trial, Vinson was thirty-one years old. Further, the State sought to exclude evidence of a shooting that occurred at Einfeldt's apartment complex the evening of the altercation between Einfeldt, Einfeldt's daughters, and Vinson. The State asserted that the police found no evidence of Vinson's involvement in the shooting or that the shooting was directed at Einfeldt. Finally, the State sought to specifically exclude testimony by Lacey Chicoine about Vinson's reputation for violence.

Einfeldt resisted this part of the motion in limine. She argued that this character evidence was admissible due to her self-defense justification defense rendering Vinson's character relevant and probative. With respect to the shots fired the evening of the altercation, Einfeldt argued that the evidence was relevant because it supported Einfeldt's belief that Vinson was a danger to her and others.

At a pretrial hearing, the district court judge reserved ruling on the admissibility of Vinson's prior felonies. The court sustained the part of the State's motion in limine with respect to the shots fired at Einfeldt's apartment complex, but emphasized that this was a preliminary ruling and stated that Einfeldt could make an offer of proof at trial at which point the court might reconsider its ruling. With respect to Chicoine's testimony about Vinson's reputation, the court stressed that proper foundation would have to be laid to show that Chicoine was aware of Vinson's reputation.

After jury selection, but before the presentation of evidence, Einfeldt again raised the issue of Vinson's prior felony convictions. The district court found that the probative value of the evidence was outweighed by its danger of unfair prejudice, given how long ago the convictions happened and Vinson's age at the time.

Later during trial, an attorney for one of Einfeldt's daughters made an offer of proof concerning Chicoine's testimony about Vinson outside the presence of the jury. Chicoine related that at one point she and Vinson were dating the same man, and Vinson threatened to "kick [Chicoine's] ass" or "beat [her] up" if Chicoine didn't stay away from the man. These threats were verbally made to Chicoine over the course of six months. Vinson never assaulted Chicoine, however. Chicoine was not aware of Vinson ever assaulting anyone.

The district court found that Chicoine's testimony about threats was only marginally relevant to the issue of Vinson's character trait of being prone to physical aggression. The court noted that Vinson only made threats and never assaulted Chicoine. The court thus excluded the evidence as more prejudicial than probative.

When Einfeldt made an offer of proof about the shots-fired incident at her apartment complex, the court ruled that evidence about the incident was inadmissible. The court found that the victim's character could not be proven by a specific instance of conduct in this case or, alternatively, that there was not clear proof that Vinson was involved in the shooting, and so the probative value of the evidence was outweighed by the danger of unfair prejudice.

At the beginning of the third day of trial, Einfeldt's attorney advised the court that his client did not remember the events of the previous day. He called his client to the stand to further make a record for the purpose of seeking a competency evaluation under Iowa Code chapter 812 (2015). When asked if she remembered the events of yesterday, Einfeldt responded, "No, I guess not. I don't know." She testified that she did not remember calling the prosecutor a liar or that

she slammed her hand down and was animated with her lawyer. Further, Einfeldt volunteered, "I just want to kill you [her lawyer]."

Einfeldt testified that she thought her lawyer was taking her written notes and giving them to the State and to other parties.[1] She admitted that she told her lawyer that she wanted to stab him "with my pen in your neck." When asked if she could pay attention to the trial, be helpful to her lawyer, and assist the court when asked to do things, she responded, "Yeah. Yeah, I don't know, I don't hear any noises. It's not buzzing. I just really—I'm in control." Einfeldt volunteered that someone was "poisoning the water." In light of this testimony, her lawyer told the court that Einfeldt has suffered from mental health issues in the past and that "the stress of the trial has caused her to be incapable of aiding [him] in her defense."

When the district court asked her if she could assist her counsel, Einfeldt said, "I just, I believe that I don't—I kind of don't, really. I do, but I don't know who he is sometimes. Right now I don't know why he's sitting by me. I don't understand this." Einfeldt recognized, however, that the person sitting next to her was her attorney. When the district court asked whether she understood the charges, she stated, "I don't,

---

[1]A few months after trial, Einfeldt filed a pro se motion for a new trial and in arrest of judgment. In the motion, she continued to express her belief that her lawyer was revealing confidential communication to the prosecution. She accused the prosecutor of engaging in prosecutorial misconduct by obtaining privileged communication between Einfeldt and her attorney and using this information to cause the State's witnesses to change their testimony. She additionally argued that she received ineffective assistance of counsel because her attorney disclosed confidential information to the prosecution. In a section apparently detailing her evidence showing that her counsel disclosed confidential communications to the prosecution, she described statements her attorney made such as telling her of his plans to go to a Subway after the outcome of the trial and order a Diet Coke, telling her that he finds dance recitals boring and would rather meet with clients, and stating to her that some evidence obtained from discovery was not admissible.

honestly. I called the F.B.I., and they said they don't think I did anything wrong."

When asked by the district court if she understood that she was being tried for the assault of Vinson, she responded, "I guess I don't know what assault means, because I think that I have a right to defend myself." When asked if she thought she had a defense to the charge, Einfeldt responded, "Yeah. I don't know."

Einfeldt told the district court that she had been diagnosed with paranoid schizophrenia, bipolar disorder, posttraumatic stress disorder, and attention deficit disorder. She stated she had prescriptions for these disorders but had not been taking her medication for a couple of months because she did not have the money.

The district court denied the request to suspend the proceedings and order a chapter 812 examination. The district court concluded that based on its observations, Einfeldt was capable of assisting counsel in providing a defense and understood the nature of the charges against her.

The district court revisited the question prior to sentencing. At this juncture, the district court had the opportunity to review Einfeldt's medical records as well as a presentence investigation (PSI) report prepared by the department of correctional services.

The medical records from 2013 showed a provisional diagnosis at Broadlawns Medical Center (Broadlawns) of paranoid schizophrenia. The records stated that Einfeldt reported leaving Minnesota because people wanted to kill her. She further stated that the television talked to her. Her thought processes were characterized in the records as delusional. A regime of drug therapy was prescribed.

The PSI report, among other things, noted that Einfeldt had been diagnosed with "Schizo-Affective Disorder and Bipolar Depression" at Broadlawns. She had episodes of paranoia in the past and had received treatment for mental health issues. Based on Einfeldt's self-report, and corroborated in the interview, the PSI report stated that Einfeldt was reporting "psychotic characteristics." The PSI report recommended an assessment by a licensed professional "to more thoroughly examine the validity and severity of these observed features."

The district court again declined to order a chapter 812 hearing. The district court stressed that up until the trial, the issue of her competency had not been presented by counsel. The district court stated that while there had been disruptive behavior, there was no behavior that indicated she did not understand the charge or was unable to assist counsel with her own defense.

The district court then moved on to sentencing, and Einfeldt was called to the stand by her attorney. In response to her attorney's questions, Einfeldt gave rambling, off-topic, and incoherent answers. For example, when her attorney asked her to confirm that they were asking the court to sentence her to probation, Einfeldt denied wanting to ask for probation and denied that she and her attorney were trying to seek probation. She announced that she did not care, and then she launched into a narrative in which she said that she could not think of three positive things about herself for the PSI report, that she was hurt by the PSI report author thinking she would reoffend, and that she would have lower recidivism because "[m]y prison number is 80655. You never forget that crap." She then explained that the first crime she committed was theft in second grade, that her mother made her stand in the cellar for a week as punishment, that she was made to feel ashamed in school,

that she is "a fighter" and no one messes with her, and that she never wanted a jury trial but instead wanted a bench trial. She concluded by denying that she cares about herself and stating, "I live my life every day for death. I don't want to be here."

After this allocution, the district court sentenced Einfeldt to a term of up to five years' incarceration. Einfeldt appealed.

**II. Standard of Review.**

We review whether a trial court should have ordered a competency hearing de novo. *State v. Mann*, 512 N.W.2d 528, 531 (Iowa 1994); *Jones v. State*, 479 N.W.2d 265, 270 (Iowa 1991).

"Evidentiary rulings are generally reviewed for abuse of discretion." *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017); *see also State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003). If a trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable," an abuse of discretion has occurred. *Buenaventura*, 660 N.W.2d at 50 (quoting *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001)); *see also Tipton*, 897 N.W.2d at 690.

**III. Overview of Requirement of Evaluation of Competency to Stand Trial.**

**A. Due Process.** Under the United States Constitution, the United States Supreme Court has declared that the conviction of an incompetent defendant violates due process. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 838 (1966). In *Dusky v. United States*, a one-page opinion, the Supreme Court declared that the test for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of

the proceedings against him." 362 U.S. 402, 402, 80 S. Ct. 788, 789 (1960) (per curium).

The Supreme Court has also declared that in order to comport with due process, there must be a procedural mechanism to determine whether a competency evaluation should be conducted. *Ford v. Wainwright*, 477 U.S. 399, 417, 106 S. Ct. 2595, 2605 (1986); *Pate*, 383 U.S. at 387, 86 S. Ct. at 843. The Supreme Court has said that due process requires a threshold hearing to be held to determine if there is sufficient doubt regarding the defendant's mental capacity to show a need for further evaluation. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 904 (1975). Further, the Supreme Court has made it clear that a defendant cannot waive the due process right to competency. *Pate*, 383 U.S. at 384, 86 S. Ct. at 841.

The constitutional commands of due process have been captured in the ABA's Criminal Justice Standards on Mental Health. Criminal Justice Standards on Mental Health (Am. Bar Ass'n 2016), https://www.americanbar.org/content/dam/aba/publications/criminal_ justice_standards/mental_health_standards_2016.authcheckdam.pdf [hereinafter Mental Health Standards]. The ABA standards generally incorporate *Dusky*, noting that the test for determining a defendant's competency when represented by counsel should be "whether the defendant has sufficient present ability to consult with defendant's lawyer with a reasonable degree of rational understanding" and whether the defendant "has a rational as well as factual understanding of the proceedings." *Id.* standard 7-5.2, at 43. The standards emphasize that the question of competence may be raised "at any stage of the proceedings." *Id.* standard 7-4.4, at 32. Defense counsel may move for a competency evaluation even if the motion is over the defendant's

objection. *Id.* standard 7-4.3(c), at 31. If a motion for a competency evaluation is made by a represented defendant after probable cause has been found that a criminal violation has occurred, the court should enter an order for an evaluation if there is "a good faith doubt" as to the competency of the defendant. *Id.* standard 7-4.4(a), at 32.

**B. Statutory Provisions.** Iowa, like many states, has adopted a statutory procedure to implement the federal due process requirements as enunciated by the Supreme Court. Iowa Code section 812.3(1) provides that "at any stage of a criminal proceeding" a competency hearing is required when the district court finds probable cause that there exist "specific facts showing that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense." The court may make a finding of probable cause either after application by the defendant or the defendant's attorney, or after holding a probable cause hearing on its own motion. *Id.* Probable cause exists for a competency hearing when a reasonable person would believe that there is a substantial question of the defendant's competency. *State v. Kempf,* 282 N.W.2d 704, 706 (Iowa 1979); *see also Moore v. United States,* 464 F.2d 663, 666 (9th Cir. 1972) (noting that due process requires that when evidence raises a reasonable doubt about the defendant's competency to stand trial, it is "substantial evidence" requiring that a competency hearing be held under the rule of *Pate*). When the district court orders an evaluation of competency, Iowa Code section 812.4 establishes a timetable for the subsequent competency hearing and the structure of the hearing.

We have emphasized that whether to hold a competency evaluation presents a legal question. *State v. Edwards,* 507 N.W.2d 393, 395 (Iowa

1993). As a result, "[t]he trial court's discretion does not play a role . . . ." *Id.* When a constitutional question is raised, our review of a district court decision regarding whether to order a competency evaluation is de novo. *Id.*

In connection with application of section 812.3, we have favorably cited *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991), for the proposition that a hearing should be held when a reasonable trial judge would experience doubt on whether the defendant was competent to stand trial. *Mann*, 512 N.W.2d at 531. *Griffin* also stands for the proposition that "an express doubt by the attorney for the accused is a legitimate factor to consider." 935 F.2d at 930.

## IV. Application of Due Process and Statutory Requirements.

Einfeldt claims that her constitutional right to due process[2] as well as her statutory rights under Iowa Code chapter 812 were violated by the refusal of the district court to order a competency hearing in this case.

Upon review of the entire record, we conclude the district court was presented with sufficient reason to order a competency evaluation under Iowa Code section 812.3, which is a statutory expression of state

---

[2]Einfeldt generically refers to "due process" and does not explicitly cite the Iowa or the United States Constitution. Under our caselaw, when a generic reference is made to a constitutional guaranty present in both the Iowa and United States Constitutions, the party does not offer a distinctive interpretation of the Iowa Constitution, and the party relies primarily on cases under the Federal Constitution, we apply the federal substantive standards, but reserve the right to apply those standards under the Iowa Constitution in a fashion different from prevailing federal authority. *State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). For independent state constitutional interpretations of the due process clause, see *State v. Cox*, 781 N.W.2d 757, 768 (2010) ("[T]he Iowa Constitution prohibits admission of prior bad acts evidence based solely on general propensity."); *War Eagle Village Apartments v. Plummer*, 775 N.W.2d 714, 721 (Iowa 2009) (holding notice by certified mail for forcible entry and detainer violates due process under Iowa Constitution); and *Callender v. Skiles*, 591 N.W.2d 182, 192 (Iowa 1999) ("We find a putative father of a child born into a marriage may have a right to standing to challenge paternity under the Due Process Clause of the Iowa Constitution.").

and federal due process requirements. The professional statement of Einfeldt's attorney regarding the difficulty of representation plays an important role. *See United States v. Sandoval*, 365 F. Supp. 2d 319, 321–22, 325–26 (E.D.N.Y. 2005) (relying heavily on the opinions of defense counsel regarding competence); *Jones v. State*, 362 So. 2d 1334, 1336 (Fla. 1978) (per curiam) (noting role of representations of counsel in determining competency issues); Richard J. Bonnie, *The Competence of Criminal Defendants: Beyond* Dusky *and* Drope, 47 U. Miami L. Rev. 539, 563 (1993) [hereinafter Bonnie] ("[T]he attorney is best situated to know whether the defendant's impairments compromise the defense of the case."). Her professed statements about wanting to kill her lawyer and stab her lawyer in the neck with a pen, her statement that she did not know why the lawyer was seated beside her, and her stated belief that her lawyer would turn over her notes to the State gives one pause. Einfeldt's lack of memory about what occurred during the prior day at trial is also troublesome.

Before the district court, Einfeldt's lawyer made a credible initial showing that Einfeldt could not have the kind of relationship with her lawyer to assist in the development of her legal defense due to her mental state. *See Dusky*, 362 U.S. at 402, 80 S. Ct. at 789. Competency evaluations include a "careful assessment of the accused's ability to interact with counsel." *See* John T. Philipsborn, *Searching for Uniformity in Adjudications of the Accused's Competence to Assist and Consult in Capital Cases*, 10 Psychol. Pub. Pol'y & L. 417, 422 (2004). Certainly competence to assist counsel includes a capacity to recognize and relate pertinent information to counsel concerning the facts of the case. Bonnie, 47 U. Miami L. Rev. at 561. The ABA standards stress the need for "present ability" to consult with counsel. Mental Health Standards,

standards 7-4.2, -5.2, -8.7, at 30, 43, 62. The ABA standards also note that a finding of incompetence to proceed may arise from any mental disorder or condition "as long as it results in a defendant's inability to consult with defense counsel . . . ." *Id.* standard 7-4.1, at 30.

Further, the "rational understanding" required under *Dusky* means more than being "oriented to time and place" but includes accurate perception of reality and proper response to the world around the defendant, not disruptive behavior and a paranoid relationship with counsel. *Lafferty v. Cook*, 949 F.2d 1546, 1550 (10th Cir. 1991) (quoting *Dusky*, 362 U.S. at 402, 80 S. Ct. at 789). Here, we have evidence of a previous diagnosis of paranoid schizophrenia, along with contemporaneous testimony about bizarre thoughts and behavior, including claims of collusion between defendant's counsel and the prosecution. *See United States v. Ghane*, 490 F.3d 1036, 1040–41 (8th Cir. 2007) (finding defendant who suffered from intermittent periods of delusional paranoia and whose behavior indicated distrust of his own lawyers incompetent); *United States v. Friedman*, 366 F.3d 975, 980–81 (9th Cir 2004) (finding defendant incompetent because paranoid schizophrenia directly prevented rational assistance in defense); *United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir. 1990) (finding defendant incompetent when record revealed inability to cooperate rationally in own defense because of paranoia); *Nagi v. People*, 389 P.3d 875, 879 (Colo. 2017) (noting "wild accusations of collusion between his counsel and the prosecution" a factor indicating need for competency evaluation).

When the record shows that the defendant wants to stab her lawyer in the neck and kill him, believes her lawyer is turning written notes over to the prosecution, recently has heard buzzing noises, claims to have been told by the FBI she did nothing wrong, states she is worried

about someone poisoning the water, and has advised the court that she has had a history of mental health issues including a diagnosis of paranoid schizophrenia, yet was noncompliant with prescribed drug therapy, a reasonable trial court should at least have some doubts as to the defendant's competency to effectively assist in the defense as required by Iowa Code section 812.3(1). *See Maxwell v. Roe*, 606 F.3d 561, 569–70 (9th Cir. 2010) (holding reasonable doubt of defendant's competence was created by defendant's history of mental illness, refusal to take prescribed antipsychotic medication, inability to control himself in the courtroom, and exhibition of paranoia impairing attorney–client relationship). Consistent with ABA Standard 7-4.1(d) related to inability to consult with defense counsel, the Supreme Court has stated that any one factor alone may sufficiently raise a reasonable doubt in the mind of a reasonable trial judge. *Dusky*, 362 U.S. at 402, 80 S. Ct. at 789; Mental Health Standards, standard 7-4.1(d), at 30.

There is, perhaps, the question of malingering. The Supreme Court addressed malingering in the context of competency evaluations in *Cooper v. Oklahoma*, 517 U.S. 348, 116 S. Ct. 1373 (1996). In *Cooper*, the question was whether a state could impose a heightened "clear and convincing" standard of proof on a defendant seeking to show incompetence. *Id.* at 362, 116 S. Ct. at 1380. In rejecting a higher standard of proof, the Supreme Court looked at the consequences of error. *Id.* at 362–63, 116 S. Ct. at 1381. According to the *Cooper* Court, "For the defendant, the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively with counsel, he may be unable to exercise other 'rights deemed essential to a fair trial.' " *Id.* at 364, 116 S. Ct. at 1381 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139, 112 S. Ct. 1810, 1817 (1992)

(Kennedy, J., concurring)). On the other hand, "[b]y comparison to the defendant's interest, the injury to the State of the opposite error—a conclusion that the defendant is incompetent when he is in fact malingering—is modest." *Id.* at 365, 116 S. Ct. at 1382. The teaching of *Cooper* regarding comparative interests of the state and the defendant is particularly compelling in the context of a preliminary proceeding to simply order a mental health evaluation.

And, it is true that Einfeldt expressed the view that trial should continue. So did the defendant in *Kempf,* who declared he desired to plead guilty and get started on prison time to "get it over with." 282 N.W.2d at 707. Such statements did not defeat the assertion of incompetence advanced by Kempf's counsel. *Id.* at 707, 710; *see also Sandoval,* 365 F. Supp. 2d at 324, 328 (finding defendant incompetent despite defendant denying incompetence). They should not do so here.

It is important that our district court judges not put the proverbial cart before the horse in the competency setting. The district court was not called upon in this case to make a definitive determination of competency. *See Moore,* 464 F.2d at 666; *Commonwealth v. Kostka,* 350 N.E.2d 444, 449 (Mass. 1976). The only question was whether the relatively low threshold had been met to require further evaluation and a *subsequent* hearing on the question of competency after a professional evaluation. *Cf. Blakeney v. United States,* 77 A.3d 328, 348 (D.C. 2013) (characterizing reasonable doubt threshold of local law on competency as not difficult to reach by design); Bonnie, 47 U. Miami L. Rev. at 563 (characterizing the threshold for referral for further inquiry as "very low in order to cleanse all cases of doubts about competence"). The trial court must take care to ensure that the preliminary hearing to determine whether there is a bona fide doubt as to the defendant's competency does

not turn into a substitute for the determination of competency itself. *State v. Bishop*, 667 P.2d 1331, 1334 (Ariz. Ct. App. 1983).

Here, it was not the district court but the PSI report which came to no specific conclusion regarding Einfeldt's mental health but, noting a diagnosis of schizo-affective disorder, "episodes of paranoia" in the past, and evidence of "multiple, and fairly significant, mood and/or anxiety disorder indicators," urged a thorough mental evaluation after sentencing. That was a good recommendation, but under the incompetency caselaw, this recommendation for a mental evaluation occurred at the wrong place and at the wrong time.

The district court relied in part upon its observations at trial. Such observations are, of course, relevant considerations. Yet, as the Supreme Court has emphasized,

> [a]lthough a defendant's demeanor during trial may be such as to obviate "the need for extensive reliance on psychiatric prediction concerning his capabilities," . . . "this reasoning offers no justification for ignoring the uncontradicted testimony of . . . (a) history of pronounced irrational behavior."

*Drope*, 420 U.S. at 179, 95 S. Ct. at 907 (first quoting Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 469 (1967); then quoting *Pate*, 383 U.S. at 385–86, 86 S. Ct. at 842). Here, in addition to the bizarre statements and conduct, there was evidence of a history of paranoid schizophrenia.[3]

---

[3]Of course, a past history of mental illness, without more, is insufficient to trigger a competency hearing under Iowa Code section 812.3 or due process. *Jones*, 479 N.W.2d at 270; *Hickey v. Dist. Ct.*, 174 N.W.2d 406, 410 (Iowa 1970). The question is one of present competency, not past malady. Further, even the presence of mental illness at trial, in and of itself, is not necessarily sufficient to trigger the requirement of a competency hearing under Iowa Code section 812.3 and due process. *See State v. Myers*, 460 N.W.2d 458, 460 (Iowa 1990); *State v. Lucas*, 323 N.W.2d 228, 233 (Iowa 1982). The present mental illness must be sufficient to give rise to a serious question as to whether the defendant meaningfully understands the charges and is capable of meaningfully assisting in the defense. Iowa Code § 812.3; *Myers*, 460 N.W.2d at 460.

The district court also relied on pretrial behavior of Einfeldt. But as the Supreme Court has noted, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181, 95 S. Ct. at 908.

There is a question of remedy. At this late date, the possibility of making a meaningful determination of competency at the time of trial given the passage of time is simply not possible. *See State v. Myers*, 460 N.W.2d 458, 460 (Iowa 1990) (holding failure to hold a competency hearing not capable of cure by an ex post facto determination sometime after trial). As a result, we reverse the judgment of the district court and remand the case for a new trial. In any subsequent trial, the district court should monitor the proceedings and ensure that the defendant's due process and statutory rights related to competency are properly protected throughout the proceedings.

## V. Evidentiary Rulings.

Einfeldt argues that the district court erred by disallowing evidence of Vinson's prior assault convictions, threats against Chicoine, and involvement in the shots-fired incident at Einfeldt's apartment complex. Because these issues may reoccur on retrial, we address them.

**A. Evidence of Violent Character of Victim.** Under Iowa Rule of Evidence 5.404(*a*)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." An exception to this rule is when a defendant seeks to offer "evidence of the victim's pertinent trait." *Id.* r. 5.404(*a*)(2)(A)(ii). While ordinarily evidence of a victim's prior violent or turbulent character is immaterial and not admissible at trial, if the

accused asserts he or she acted in self-defense, specific instances of the victim's conduct may be used to demonstrate his or her violent or turbulent character. *State v. Webster*, 865 N.W.2d 223, 243 (Iowa 2015); *State v. Jacoby*, 260 N.W.2d 828, 837 (Iowa 1977).

Yet, if such evidence's probative value is substantially outweighed by danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," a court may exclude the evidence. Iowa R. Evid. 5.403. We use a two-part test to determine whether evidence should be excluded under rule 5.403. *Webster*, 865 N.W.2d at 242; *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013). "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." *Webster*, 865 N.W.2d at 242 (quoting *Huston*, 825 N.W.2d at 537). In weighing the probative value against the danger of unfair prejudice, we consider,

> (1) the need for the proffered evidence "in view of the issues and other available evidence," (2) whether there is clear proof it occurred, (3) the "strength or weakness of the prior-acts evidence in supporting the issue sought to be prove[d]," and (4) the degree to which the evidence would improperly influence the jury.

*State v. Martin*, 704 N.W.2d 665, 672 (Iowa 2005) (quoting *State v. Henderson*, 696 N.W.2d 5, 11 (Iowa 2005)). "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.'" *State v. Putman*, 848 N.W.2d 1, 10 (Iowa 2014) (quoting *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006)).

We believe that the district court acted within its discretion when it found that both the evidence of Vinson's prior felonies and Chicoine's testimony about threats were inadmissible under Iowa Rule of Evidence

5.403. With respect to the prior felonies, these assaults occurred over ten years ago, when Vinson was fifteen or sixteen and nineteen respectively. As our juvenile sentencing caselaw emphasizes, an adolescent's character is frequently not formed, and such adolescents often develop into adults with completely different characters. *See State v. Sweet*, 879 N.W.2d 811, 833 (Iowa 2016). Without any more recent evidence of convictions for assaults, evidence of assault convictions occurring during adolescence says very little about Vinson's adult character. The district court properly excluded this evidence as being substantially more prejudicial than probative.

Further, we find that the district court acted within its discretion when it excluded Chicoine's testimony about receiving threats from Vinson. As the district court noted, Vinson never assaulted Chicoine. Verbal threats are not very probative on the issue of a person's tendency toward physical confrontations and violence.

**B. Evidence of Shots Fired.** We affirm the district court's ruling excluding evidence of the shots-fired incident at Einfeldt's apartment complex. There was simply not enough evidence linking Vinson with the shooting or that Einfeldt or her daughters were the targets of the shooting. *See* Iowa R. Evid. 5.403; *id.* r. 5.404(*a*)(2)(A)(ii); *Martin*, 704 N.W.2d at 672. The district court was within its discretion in finding that this evidence was not relevant to Vinson's character.

**VI. Conclusion.**

For the above reasons, the judgment of the district court is reversed and the case remanded to the district court for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I respectfully dissent in part. The majority's reading of the record is selective. Based on my review of the entire record, the district court should not be reversed. Rather, its handling of the trial should be applauded as a model of how to deal with a difficult defendant.

Wonetah Einfeldt made some bizarre statements during the trial. But they were always out of the presence of the jury. When the jury was present, Einfeldt's behavior changed. She made occasional, targeted interjections, generally to express her disagreement with unfavorable testimony. In today's impolite world, this hardly sets her apart.

Viewing the trial as a whole, Einfeldt showed a sophisticated understanding of the proceedings. She ultimately worked well with her defense counsel, heeding his undoubtedly sound advice that she not take the stand and instead allow the defense case to be presented through the testimony of her codefendants.

The majority opinion sets the bar too low for when a defendant can hold up a trial by being disruptive or making bizarre remarks. I fear today's decision will make trial management more difficult for our trial judges.

Like the majority, I take the issue of mental illness seriously. But I think their opinion is naive. According to the Iowa Department of Corrections, over half of Iowa prisoners have either a serious mental illness or a chronic mental health diagnosis. *See* Iowa Dep't of Corr., *Mental Health Information Sharing Program* 1 (Jan. 2017), http://idph.iowa.gov/Portals/1/Meetings/MeetingFiles/OtherFiles/95/8 d8a73aa-da57-475e-b44f-77c91800cbd0.pdf. Mental illness and criminal conduct to some extent go together. Except in exceptional cases

when the criteria of Iowa Code section 812.3 have been met, mental illness is not a reason to halt a criminal trial, thereby necessitating a later do-over.

### I. The Facts Revisited.

The majority characterizes this case as a "physical altercation between [Einfeldt and her two daughters] and a fourth woman named Mulika Vinson on July 14, 2015." This sanitized description of the case does not do justice to its facts. The evidence of Einfeldt's guilt was quite strong.

The trial evidence showed that this was a deliberate, planned beating of the victim (Vinson). Two bystanders saw what happened and testified at trial. Most importantly, one of those bystanders managed to record part of the beating on his cell phone. The video was replayed at trial. As we know from current events, video evidence can be very powerful. It was powerful here.

**A. The Events of July 14, 2015.** On July 14, 2015, Einfeldt, accompanied by her daughters Danielle and Beatrice Abang-Ntuen, walked up to the front door of Vinson's home in Perry. Vinson was at home with her five-year-old daughter and her four-year-old son. The impetus for the visit was apparently an ongoing feud between Danielle and Vinson over a male coworker.

Meanwhile, two individuals were putting up siding on a nearby house. They heard the commotion and witnessed much of the altercation. One of them later testified that Einfeldt, Danielle, and Beatrice were coming down the street, "angry and looking for a fight." According to this worker, Einfeldt and her daughters yelled at Vinson to come out of her house, which she did. This same worker testified that Danielle initiated the altercation and Einfeldt and Danielle then grabbed

Vinson together and threw her to the ground. He recalled that Einfeldt and Danielle did most of the damage to Vinson, but Beatrice also delivered a few blows.

The other worker likewise testified that he saw the three women walking up to Vinson's house, yelling for Vinson to come out. He saw Vinson standing inside the door, reluctant to come outside, although she eventually did. According to this worker, Vinson kept telling the defendants her children were watching. This worker then saw Einfeldt, Danielle, and Beatrice dragging Vinson by the arms and beating her. He recorded a portion of the altercation on his cell phone before he intervened to stop it. The cell phone video, although only a few seconds long, shows both Einfeldt and Danielle dragging and striking Vinson as she lies helpless on the ground. Beatrice is standing and watching, just a few feet away.

Once the second worker intervened, Einfeldt and her two daughters started to walk away down the street. The worker followed them on foot as he spoke on his cell phone with the Perry police department. Vinson remained on the ground injured.

The police arrived soon afterward. Einfeldt and Danielle were taken into custody. Einfeldt told the police, "I beat her mother____ ass, now book me up." When Einfeldt was advised that paramedics were with Vinson, she said something to the effect that "she's going to need them." Vinson was admitted to a hospital later that evening and treated for her injuries.

**B. Trial Begins.** On August 5, Einfeldt and both daughters were charged with willful injury causing bodily injury. *See* Iowa Code § 708.4(2) (2015). The defendants were tried jointly beginning on April 18, 2016.

Einfeldt and Danielle raised justification as a defense, while Beatrice denied participating in the assault. All of them asserted that Vinson had brandished a handgun in a threatening manner when she answered the door. They admitted they didn't see the gun after that.

Vinson denied she had a gun. No one found a gun. The construction workers never saw a gun or heard anyone say anything about a gun. It defies common sense that Vinson would have brandished a gun when answering the door, then walked outside without the gun to subject herself to the mercy of the three angry defendants.

As the trial went on, Einfeldt was disruptive at times. During the prosecutor's opening statement, she made interjections out loud three times. The third time, the court took a recess. Out of the presence of the jury, the court had a colloquy with Einfeldt. During this colloquy, Einfeldt took the opportunity to correct a factual statement the prosecutor had made relating to the admissibility of Vinson's prior convictions. Still, she agreed to keep quiet in the future. She also explained that she has anxiety and if she starts having a panic attack, it usually starts with coughing and she would need to leave. The court advised her to let her attorney know "or raise your hand, and we'll take a recess. . . . We do want to accommodate those health issues."

Vinson was the State's first witness to testify. Einfeldt kept silent throughout her testimony. One of the bystander workers testified next. During his cross-examination, Einfeldt said "objection" one time after he gave a harmful answer.

**C. The Probable Cause Hearing.** The next morning, before the jury was summoned, Einfeldt's counsel advised the court that Einfeldt had told him "she did not remember the events of yesterday" and had discussed "her current mental state" with him. He asked permission to

make a record as to Einfeldt's mental condition. The district court agreed.

When questioned by her counsel, Einfeldt said she remembered "some" of the evidence from the previous day and "want[ed] to go forward." But when counsel asked Einfeldt if she thought she would be able to pass notes to him when needed, Einfeldt answered, "No, because I don't want you reading my notes. I don't know if I trust—I mean, I do. I think you're a good person. But I just want to kill you. I don't know you." She acknowledged that the previous day she had been upset because she thought her counsel was passing her notes to other parties. She said she had wanted to stab her counsel with a pen in the neck, although she didn't. Yet she said she thought she would be able to pay attention to the trial and was "in control." She concluded,

> I don't want to go [to] the hospital. I don't want to go back. I don't want to go to Oakdale. I just want to finish this, and whatever happens just happens. And I want my kids to be all right, and I just don't know what to do. I don't want to answer any more questions.

Einfeldt interjected one further comment: "I think she's poisoning the water."

At this point, Einfeldt's counsel represented to the court, "I don't believe nor have ever felt threatened by her." Nonetheless, he moved to suspend the proceedings under Iowa Code chapter 812, relating to competency to stand trial.

The State opposed the motion. It urged there had been no showing that Einfeldt did not understand the nature of the charges and their consequences or that she was unable to assist in her defense.

The district court questioned Einfeldt further. Einfeldt claimed she had "a diagnosis of paranoid schizophrenia with manic bipolar, PTSD

and ADD, or something like that." She said she had prescriptions but had not taken them for a couple of months for financial reasons.

The district court denied the motion to suspend the trial. It explained,

> Based upon my observations, not only during the first two days of this trial, but during previous hearings, it appears to me as if Ms. Einfeldt is capable of assisting Mr. Macro in providing a defense.
>
> I do believe she understands the nature of the charges. Just the explanation of the defenses that she believes she has, suggest to me that conversely she understands the underlying charges.

The court added that the previous day had gone relatively smoothly and reassured Einfeldt that if she needed to take a break, she could do so.

**D. The Trial Continues.** During the course of that morning's testimony, Einfeldt said, "Liar," once during the testimony of a police officer. She later blurted, "I never said that," when another police officer referred to a statement Einfeldt supposedly made. Later, she said, "Ha ha ha," and slapped the table when that officer claimed the only injury he saw on a photograph of Danielle's face was a mosquito bite.

After the jury had been excused for the morning, defense counsel for Danielle and Beatrice complained that Einfeldt had been putting her head down and pulling out tissues loudly and stuffing them back in the box, "all disruptive behavior." The district court denied their motion for mistrial, although it agreed these events had occurred.

In the afternoon, Einfeldt made three brief audible comments during the testimony of the worker who had taken a video of the altercation. Thereafter, the State rested and the jury was excused again. At this point, Einfeldt became a more active participant.

All three defense counsel argued motions for judgment of acquittal. When they were denied, Einfeldt inquired of the district court, "Can I ask one question off the record? Do you ever grant dismissal? I just want to ask." After the prosecutor later argued for the exclusion of a defense witness, Einfeldt asked, "Why are you guys trying to hide the truth? I can't understand that." When there was a discussion about whether the defendants would testify, Einfeldt stated, "I'm telling everybody [Vinson] drove by my house and tried to shoot us"—a reference to an incident that had been excluded based on a motion in limine ruling. She added, "I [will] tell everything that you guys are trying to hide, all the lies that you're making people tell." Her counsel requested a break, and the jury then returned and two defense witnesses testified without incident.

The day concluded with an offer of proof out of the jury's presence. As her attorney concluded his offer-of-proof examination of one witness, Einfeldt added a suggestion that he ask the witness about having received a controlled substance from Vinson. Later, while the prosecutor was cross-examining this same witness during the offer of proof, Einfeldt inquired, "Why are we redeposing her? What is going on?"

When Einfeldt's counsel requested permission to speak privately with Einfeldt, Einfeldt said she wanted "everything on the record," and "she can't take this." She asked generally, "Why [are] you hiding the truth?" She added that she wanted an African-American lawyer. The district court explained the purpose of the offer of proof to her. Einfeldt countered,

> I want to know how come everything that's in front of the jury has to be screened by you, but everything that she [(the prosecutor)] put in, all the lies that she told, was not screened by you. I don't get it. We're supposed to have more rights than her.

The court responded that it had explained the offer of proof as best as it could and asked Einfeldt to agree to remain quiet during the remainder of the offer.

The next day was uneventful until the time came to make a record on Einfeldt's decision whether to testify or not. She indicated she wanted to testify and continued to argue about the shooting incident that the district court had excluded. The district court emphasized that Einfeldt would be able to answer the questions asked and nothing more. Einfeldt further commented that "[t]he judge is a good guy" and later added that she wanted a trial before the judge rather than the jury.

The jury returned, and Einfeldt generally behaved well as defense witnesses, including Danielle and Beatrice, testified. Meanwhile, Einfeldt had changed her mind and decided not to testify on the advice of her counsel. A record was made with the court out of the jury's presence.

Closing arguments took place the next day, the final day of trial. Einfeldt said nothing during the prosecutor's initial argument or the arguments of the other defense counsel. She corrected her counsel when he said "Beatrice" instead of "Danielle" during closing argument and clapped at the end of that closing. Otherwise, she was quiet. However, during the prosecutor's rebuttal argument, Einfeldt made three brief interjections. Following the third, the district court advised her that if she did that again, she would have to be removed from the courtroom. At that point, Einfeldt voluntarily got up and left.

The jury returned guilty verdicts against Einfeldt and Danielle. It found Beatrice guilty of the lesser-included offense of assault.

**E. Sentencing.** A presentence investigation report (PSI) was prepared on Einfeldt. Attached to it were two records from Broadlawns Medical Center relating to Einfeldt. In June 2013, Einfeldt appeared at

Broadlawns for a psychiatric evaluation complaining of "feeling stressed out." Einfeldt stated that she had been hospitalized at age seventeen[4] and had had recurring paranoia and "exacerbations of her paranoid symptoms" since then but no other hospitalizations. According to the report, she believed she was "married to the devil" and was "vague about hearing voices." However, she "did not want to discuss past diagnoses."

The Broadlawns report gave her a "provisional" diagnosis of paranoid schizophrenia and noted "hallucinations (questionable)." Einfeldt was prescribed one new medication and told to follow up in a month, but she did not return.

Einfeldt next went for another psychiatric evaluation at Broadlawns in October 2015, after she had been charged in this case. She said she had not returned after the first visit "because upon her leaving she saw a body bag." She complained again of paranoia. Once again, the same medication was prescribed, and Einfeldt was told to follow up in one month which, again, she did not do.

The PSI recommended incarceration of Einfeldt. It further recommended that while incarcerated, she obtain a mental health evaluation and be screened for an assaultive behavior class or anger management.[5]

The PSI also included Einfeldt's version of the offense. There, Einfeldt did not mention any mental health concerns. Instead, she provided—in her own words and handwriting—a statement that deftly accepted a degree of responsibility. She wrote, "I am not justifying my

---

[4]Einfeldt was forty-one years old at the time of this evaluation.

[5]According to the PSI, Einfeldt admitted attempting suicide as a teenager, over twenty years before. Einfeldt denied this at the sentencing hearing and denied any suicidal ideations or attempts.

behavior. I take full responsibility for the fight . . . ." Yet she then repeated her claims that Vinson had a gun and that she (Einfeldt) was acting in self-defense. Still, she concluded, "Self-defense doesn't constitute beating the holy crap out of someone even if they have a gun."

The district court began the sentencing hearing by considering Einfeldt's motion for new trial. That motion had, among other things, reraised the question of competency. Concerning Einfeldt's competency, the court explained it had now considered the PSI and attached medical records in addition to the trial and pretrial proceedings. It stated as follows,

> Here's what I note regarding that issue: The trial information in this case was filed on August 5, 2015. There was no application for an 812 exam from that date until trial started on April 20[, 2016]. So I infer from that, and I believe it's a reasonable inference, that up until the time Mr. Macro brought this issue to my attention, there was not a concern about Ms. Einfeldt's legal competency.

> During the trial it did appear to me as if Ms. Einfeldt was participating in her defense. She also responded appropriately during the colloquy regarding her decision to not testify.

> Without question, Ms. Einfeldt did engage in disruptive behavior during the trial, but that may have been simple disrespect. Or I think in Ms. Einfeldt's case it was probably spontaneous emotional outbursts. But that is different from being legally incompetent.

> I did not observe behavior that suggested Ms. Einfeldt did not understand the charge or the proceedings or that she was unable to assist with her own defense.

After denying the motion for new trial, the court proceeded to sentencing. Einfeldt testified she had been diagnosed with different mental diagnoses but did not agree with those diagnoses. She elaborated that she was not seeing a doctor or therapist or taking any medications. She addressed the judge and said, "I do respect you." She added, "I do

respect the whole system. I believe in the law." She went through much of her prior life history, including past brushes with the law. She acknowledged that "there's a[n] appeal going to be filed in this case," and said she understood "what reversible error is." She stated, "I do honestly believe the Judge was fair," but "[t]he rules are slanted, and they're in favor of [the] State." She testified that if she were put on probation, she would have a job and a place to live and she would comply with the terms of probation. She made no references to any delusions or impulses or paranoia.

The district court sentenced Einfeldt to an indeterminate term of five years' incarceration. *See* Iowa Code § 902.9(1)(*e*).

**II. The District Court Properly Denied Einfeldt's Motion to Terminate the Trial for Purposes of a Competency Hearing.**

The fighting issue is whether the district court erred in denying Einfeldt's request to suspend proceedings for a competency hearing during the second day of trial. Had the court done so, this would of course have necessitated a new trial at a later date.

**A. The Controlling Law.** Iowa Code section 812.3 governs this issue and provides,

> If at any stage of a criminal proceeding the defendant or the defendant's attorney . . . alleges specific facts showing that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense, the court shall suspend further proceedings and determine if probable cause exists to sustain the allegations.

Iowa Code § 812.3(1) (2016). Additionally, *if* the court finds probable cause to sustain the allegations,

> [T]he court shall suspend further criminal proceedings and order the defendant to undergo a psychiatric evaluation to determine whether the defendant is suffering a mental disorder which prevents the defendant from appreciating the

charge, understanding the proceedings, or assisting effectively in the defense.

*Id.* § 812.3(2). The psychiatric evaluation is then followed by a competency hearing. *Id.* §§ 812.4–.5.

Although Iowa has long had provisions relating to mental incompetency of the accused, this two-step process of a probable cause hearing followed by an evaluation and a competency hearing if necessary dates only to 2004. *See* 2004 Iowa Acts ch. 1084, § 5 (codified at Iowa Code § 812.3 (2005)). Here, the district court followed the correct procedure. It suspended the proceedings briefly and temporarily so that Einfeldt's counsel and the court could examine her, and so the parties could provide argument and additional information to the court. Hence, the court conducted the clearly required probable cause hearing. But it denied Einfeldt's request to terminate the trial so she could undergo a psychiatric evaluation and a full-blown competency hearing.

Under our precedent, a competency hearing should be granted when the "record contains information from which a reasonable person would believe a substantial question of the defendant's competency exists." *Jones v. State*, 479 N.W.2d 265, 270 (Iowa 1991) (quoting *State v. Kempf*, 282 N.W.2d 704, 706 (Iowa 1979)). We consider three factors: "(1) the defendant's irrational behavior, (2) any demeanor at the trial that suggests a competency problem, and (3) any prior medical opinion on the defendant's competency to stand trial." *State v. Edwards*, 507 N.W.2d 393, 395 (Iowa 1993).

These factors illuminate for us the ultimate question of competency facing the judge: whether the defendant is prevented from "appreciating the charge, understanding the proceedings, or assisting effectively in the defense." Iowa Code § 812.3(1) (2016); *see also State v.*

*Johnson*, 784 N.W.2d 192, 194 (Iowa 2010). Mental illness alone is not sufficient to establish incompetency. *See State v. Rieflin*, 558 N.W.2d 149, 152–53 (Iowa 1996), *overruled on other grounds by State v. Lyman*, 776 N.W.2d 865, 873 (Iowa 2010). Furthermore, we presume that the defendant is competent to stand trial. *Lyman*, 776 N.W.2d at 874 *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016).

**B. Applying the Law Here.** Applying each of these tests and standards, I agree with the district court that probable cause did not exist to stop the trial and order Einfeldt to undergo a psychiatric evaluation and a competency hearing. There is no question that Einfeldt understood she had been charged with assaulting and injuring Vinson on July 14, 2015. She recognized she had been offered before trial the opportunity to plead to two aggravated misdemeanors but without the chance to argue for a deferred judgment. She declined this offer. She also understood justification was her primary defense. She was able to explain this defense to the district court during the probable cause hearing.

Einfeldt's comprehension of the proceedings is vividly illustrated by her own statements, both in and out of the presence of the jury. Typically, Einfeldt's interjections in front of the jury were brief comments disputing testimony or statements that she recognized were harmful to that defense. For example: "Lie," "No they didn't," "Liar," "Ha ha ha," "I never said that," "Ha." Sadly, these kinds of courtroom disruptions are not all that uncommon and aren't limited to litigants suffering from mental illness. *See United States v. Clements*, 522 F.3d 790, 796 (7th Cir. 2008) ("Clements's behavior at trial does not suggest incompetence;

it was merely Clements's attempts to interject his own view of the issues and generally frustrate the progress of the trial.").[6]

Outside the jury's presence, Einfeldt took the opportunity to debate legal points with the court. She questioned why her evidence had to undergo an offer-of-proof screening process, when the State's did not. She threatened to circumvent the court's ruling excluding certain evidence by taking the stand. When the State decided to cross-examine a witness during the defendants' offer of proof, she asked, "Why are we redeposing her?" At one point she told the court, "We're supposed to have more rights than [the prosecutor]." These comments demonstrate Einfeldt's savvy, not an inability to understand the proceedings. *See id.* ("While Clements was at times disruptive, his objections, questions, and suggestions were generally pertinent to the issues being addressed, indicating that Clements was fully attentive to the proceedings and readily offered suggestions and opinions about the evidence and his defense.").

The record also indicates that Einfeldt was able to assist effectively in her defense. Despite the distrust she claimed to have for her attorney at the beginning of the second day of trial, she communicated effectively with him about her case through the rest of the proceedings. She did not hesitate to direct him toward facts she believed were helpful to her. She generally consulted off the record with him when he asked. Despite her ebullience she ultimately accepted his recommendation not to testify. She applauded when he completed his closing argument on her behalf.

---

[6]Other interjections just showed that she was paying careful attention. When counsel for one of the codefendants started cross-examining a witness who had the same last name as this counsel, Einfeldt piped up, "No relation." Also, as noted earlier, Einfeldt corrected her defense counsel when he inadvertently referred to the wrong daughter in closing argument.

Einfeldt apparently suffers from certain mental health conditions, and she testified that she had some disturbing impulses. But apart from making audible editorial comments, and a few theatrical gestures, she generally controlled those impulses in front of the jury until she walked out just a few minutes before the prosecutor finished her rebuttal closing argument. It is true she made some bizarre statements, but *never in the presence of the jury.* And Einfeldt's counsel made clear that he never felt threatened by her.

Here we have the benefit of the trial court's observations of Einfeldt's demeanor. *See Johnson,* 784 N.W.2d at 195. It concluded that Einfeldt was actively engaged with her counsel in the defense of her case. Nothing in the record contradicts that.

This does not mean that Einfeldt's outbursts helped her cause. Defendants are often their own worst enemy. Yet disruptive statements by a defendant need to be distinguished from those matters that ultimately tip the scales under Iowa Code section 812.3. Those matters are whether the defendant understands the charges and the proceedings and can effectively assist her counsel. A defendant who engages in rude or even offensive behavior in front of the jury may still be able to effectively assist counsel. Many cases have so found. *See United States v. Perkins,* 787 F.3d 1329, 1339–40 (11th Cir. 2015) (holding that the district court did not abuse its discretion in not ordering a competency hearing before trial because the defendant chose to "act like a . . . lunatic" during the trial but appeared lucid in other interactions (alteration omitted)); *Paul v. United States,* 534 F.3d 832, 845 (8th Cir. 2008) (finding the defendant had not shown the district court would have found him incompetent, despite the fact that his obstreperous behavior during trial was "unwise and detrimental to him and his cause");

*Clements*, 522 F.3d at 796 (finding the district court did not err in not sua sponte ordering a competency hearing, despite the defendant's disruptive interjections throughout trial, because "his objections, questions, and suggestions were generally pertinent to the issues being addressed, indicating that [the defendant] was fully attentive to the proceedings and readily offered suggestions and opinions about the evidence and his defense"); *United States v. Rivers*, No. 95–1364, 1996 WL 167748, at *1 (2d Cir. Apr. 10, 1996) (holding that the district court did not err in not ordering a hearing into the defendant's competency to stand trial, even though the defendant's behavior at trial was "at times unruly," because his interjected "remarks were generally directly responsive to what was being discussed"); *Foster v. Wainwright*, 686 F.2d 1382, 1383–86 (11th Cir. 1982) (per curiam) ("reject[ing] as meritless" the defendant's claim that the trial court erred in not ordering a hearing on his competency to stand trial, even though the defendant frequently interrupted the proceedings, to the point that the judge justifiably removed him from the courtroom); *State v. Woods*, 348 P.3d 583, 592–93 (Kan. 2015) (holding that district court did not abuse its discretion in not ordering a reevaluation of competency because the defendant exhibited disruptive behavior that was unrelated to what was occurring in trial but was "isolated and could easily be attributed to an attempt to derail the judicial process"); *State v. McCoy*, 218 So. 3d 535, 617–20 (La. 2016) (finding a second sanity commission was not justified, even when the defendant was disruptive during trial, in part because he "exercised self-control when he wanted to"); *Commonwealth v. Holland*, 73 N.E.3d 276, 286 (Mass. 2017) (affirming a determination of competency when at the competency hearing the doctor noted that the defendant's "outbursts [and] bouts of uncooperativeness with attorneys . . . make him a

problematic defendant, but not an incompetent one" (alteration omitted)); *Hutto v. State*, 227 So. 3d 963, 976 (Miss. 2017) (finding that after a pretrial hearing had determined competency, a subsequent midtrial outburst did not change the determination because the defendant was not "incoherent and deluded during trial; rather, . . . [the defendant] actively participated in the proceedings and engaged in discussions with his counsel"); *State v. Ramirez*, No. S–1–SC–34576, 2016 WL 7029226, at *4–5 (N.M. Dec. 1, 2016) (finding there was no basis for a reevaluation of competency, even though defendant "was labile, crying, interrupting, and making statements contrary to his interests during trial").

The additional information made available at the time of sentencing did not alter the district court's view of the matter, and does not alter mine. According to a medical record attached to the PSI, Einfeldt received a "provisional" diagnosis of paranoid schizophrenia and "hallucinations (questionable)" in 2013. Yet she did not return for another consultation until she had been criminally charged, more than two years later. Then she didn't return again.

Einfeldt's conduct during sentencing does not suggest incompetence. Rather, Einfeldt testified and allocuted at some length on her own behalf. Einfeldt's statements—and the letter she wrote to the judge beforehand—amounted to a detailed recital of extenuating circumstances and a plea for clemency. She artfully complimented the trial judge on his fairness. In her only reference to mental health conditions, she minimized them. She made no odd statements whatsoever.

I accept as unresolved the actual status of Einfeldt's mental illness. The PSI appropriately recommended a formal diagnostic assessment of the "validity and severity" of Einfeldt's mental health

issues if she were sentenced to prison. However, for present purposes, the question is whether the record establishes probable cause to believe that Einfeldt was prevented from appreciating the charge, understanding the proceedings, or assisting in her defense. *See* Iowa Code § 812.3(1), (2). The record did not show any of these things.

Cases finding incompetency or probable cause for incompetency correctly focus on the effects of mental illness, rather than the mere presence of mental illness. *See, e.g., Maxwell v. Roe*, 606 F.3d 561, 569–70, 576 (9th Cir. 2010) (noting the defendant requested his attorney turn over evidence that would be helpful to the prosecution, refused to attend or even listen to the trial proceedings, and tried to kill himself during trial); *United States v. Ghane*, 490 F.3d 1036, 1040–41 (8th Cir. 2007) (affirming a finding of incompetency to stand trial on a "clear error" standard of review given the defendant's belief that the charges against him were part of a "wide ranging government conspiracy related to events that occurred in the early 1990s" and the defendant's insistence on calling irrelevant witnesses); *United States v. Friedman*, 366 F.3d 975, 981 (9th Cir. 2004) (affirming a finding of incompetency to stand trial because the defendant's "paranoid schizophrenia [was] preventing him from working with his attorney"); *Lafferty v. Cook*, 949 F.2d 1546, 1549, 1555 (10th Cir. 1991) (noting the defendant refused to let his attorney present evidence and "suffered from paranoid delusions which drove his decision in these proceedings"); *United States v. Hemsi*, 901 F.2d 293, 294, 296 (2d Cir. 1990) (affirming a finding of incompetency to stand trial where expert testimony indicated that defendant could maintain his composure "only on rare, non-threatening occasions" and his own attorney, even while opposing a finding of incompetence, "disclaimed any view that [the defendant] could make any rational decisions regarding the

defense"); *Nagi v. People*, 389 P.3d 875, 877, 879 (Colo. 2017) (affirming the trial judge had a "good faith basis" to hold a competency hearing in light of defendant's questionable decision to represent himself in a case involving potential life sentence plus "wild accusations" and other "aberrant behavior").

I am convinced the district court gave the competency question the serious attention it deserved and made an appropriate ruling that applied the correct law to the facts. Given my agreement with the majority's resolution of the evidentiary issues, I would affirm Einfeldt's conviction and sentence.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.